## LABINE, TUTRIX *v.* VINCENT, ADMINISTRATOR

No. 5257.   Argued January 19, 1971—Decided March 29, 1971

See: 229 So. 2d 449.

BLACK, J., delivered the opinion of the Court, in which BURGER, C. J., and HARLAN, STEWART, and BLACKMUN, JJ., joined. HARLAN, J., filed a concurring opinion, *post,* p. 540. BRENNAN, J., filed a dissenting opinion, in which DOUGLAS, WHITE, and MARSHALL, JJ., joined, *post,* p. 541.

*James J. Cox* argued the cause and filed a brief for appellant.

*James A. Leithead* argued the cause for appellee. With him on the brief was *Norman F. Anderson.*

Briefs of *amici curiae* urging reversal were filed by *Harry D. Krause, Norman Dorsen,* and *Melvin L. Wulf* for the American Civil Liberties Union, and by *Jonathan Weiss* and *David Gilman* for the Center on Social Welfare Policy and Law.

Briefs of *amici curiae* urging affirmance were filed by *Jack P. F. Gremillion,* Attorney General, for the State of Louisiana, and by *A. Leon Hebert* and *E. Drew McKinnis* for the Buras Heirs et al.

MR. JUSTICE BLACK delivered the opinion of the Court.

In this appeal the guardian (tutrix) of an illegitimate minor child attacks the constitutionality of Louisiana's laws that bar an illegitimate child from sharing equally with legitimates in the estate of their father who had publicly acknowledged the child, but who died without a will. To understand appellant's constitutional arguments and our decision, it is necessary briefly to review the facts giving rise to this dispute. On March 15, 1962, a baby girl, Rita Vincent, was born to Lou Bertha Patterson (now Lou Bertha Labine) in Calcasieu Parish, Louisiana. On May 10, 1962, Lou Bertha Patterson and Ezra Vincent, as authorized by Louisiana law, jointly executed before a notary a Louisiana State Board of Health form acknowledging that Ezra Vincent was the "natural father" of Rita Vincent.[1] This public acknowledgment of parentage did not, under Louisiana law, give the child a legal right to share equally with legitimate children in the parent's estate but it did give her a right to claim support from her parents or their heirs. The acknowledgment also gave the child the capacity under Louisiana law to be a limited beneficiary under her father's will in the event he left a will naming her, which he did not do here.

Ezra Vincent died intestate, that is, without a will, on September 16, 1968, in Rapides Parish, Louisiana, leaving substantial property within the State, but no will to direct its distribution. Appellant, as the guardian of Rita Vincent, petitioned in state court for the appointment of an administrator for the father's estate; for

---

[1] See App. 8.

a declaration that Rita Vincent is the sole heir of Ezra Vincent; and for an order directing the administrator to pay support and maintenance for the child. In the alternative, appellant sought a declaration that the child was entitled to support and maintenance of $150 per month under a Louisiana child support law.[2]

The administrator of the succession of Ezra Vincent answered the petition claiming that Vincent's relatives were entitled to the whole estate. He relied for the claim upon two articles of the Louisiana Civil Code of 1870: Art. 206, which provides:

> "Illegitimate children, though duly acknowledged, can not claim the rights of legitimate children. . . ."

and Art. 919, which provides:

> "Natural children are called to the inheritance of their natural father, who has duly acknowledged them, when he has left no descendants nor ascendants, nor collateral relations, nor surviving wife, and to the exclusion only of the State."

The court ruled that the relatives of the father were his collateral relations and that under Louisiana's laws of intestate succession took his property to the exclusion of acknowledged, but not legitimated, illegitimate children. The court, therefore, dismissed with costs the guardian mother's petition to recognize the child as an heir. The court also ruled that in view of Social Security payments of $60 per month and Veterans Administration payments of $40 per month available for the support of the child, the guardian for the child was not entitled to support or maintenance from the succession of Ezra Vin-

---

[2] La. Civ. Code Ann., Art. 240, provides: "Fathers and mothers owe alimony to their illegitimate children, when they are in need . . . ." Art. 241 provides: "Illegitimate children have a right to claim this alimony, not only from their father and mother, but even from their heirs after their death."

cent.[3]  The Louisiana Court of Appeal, Third Circuit, affirmed and the Supreme Court of Louisiana denied a petition for writ of certiorari.  The child's guardian appealed and we noted probable jurisdiction.  400 U. S. 817 (1970).

In this Court appellant argues that Louisiana's statutory scheme for intestate succession that bars this illegitimate child from sharing in her father's estate constitutes an invidious discrimination against illegitimate children that cannot stand under the Due Process and Equal Protection Clauses of the Constitution.  Much reliance is placed upon the Court's decisions in *Levy* v. *Louisiana*, 391 U. S. 68 (1968), and *Glona* v. *American Guarantee & Liability Insurance Co.*, 391 U. S. 73 (1968). For the reasons set out below, we find appellant's reliance on those cases misplaced, and we decline to extend the rationale of those cases where it does not apply.  Accordingly, we affirm the decision below.

In *Levy* the Court held that Louisiana could not consistently with the Equal Protection Clause bar an illegitimate child from recovering for the wrongful death of its mother when such recoveries by legitimate children were authorized.  The cause of action alleged in *Levy* was in tort.  It was undisputed that Louisiana had created a statutory tort [4] and had provided for the survival of the deceased's cause of action,[5] so that a large class of persons injured by the tort could recover damages in compensation for their injury.  Under those circumstances the Court held that the State could not totally exclude from

---

[3] Rita Vincent qualifies as Ezra Vincent's child for federal social security and veteran's benefits by virtue of his acknowledgment of paternity, 42 U. S. C. § 416 (h) (3) (A) (i) (I)  (1964 ed., Supp. V) and 38 U. S. C. § 101 (4) (1964 ed., Supp. V).  No question has been raised concerning the legality under federal law of reliance upon such benefits to relieve parents or their estates from the state-imposed obligations of child support.

[4] La. Civ. Code Ann., Art. 2315 (1952).

[5] *Ibid.*

the class of potential plaintiffs illegitimate children who were unquestionably injured by the tort that took their mother's life. *Levy* did not say and cannot fairly be read to say that a State can never treat an illegitimate child differently from legitimate offspring.[6]

The people of Louisiana, through their legislature have carefully regulated many of the property rights incident to family life. Louisiana law prescribes certain formalities requisite to the contracting of marriage.[7] Once marriage is contracted there, husbands have obligations to their wives.[8] Fathers have obligations to their children.[9] Should the children prosper while the parents fall upon hard times, children have a statutory obligation to support their parents.[10] To further strengthen and preserve family ties, Louisiana regulates the disposition of property upon the death of a family man. The surviving spouse is entitled to an interest in the deceased spouse's estate.[11] Legitimate children have a right of forced heirship in their father's estate and can even retrieve property transferred by their father during his lifetime in reduction of their rightful interests.[12]

---

[6] Nor is *Glona* v. *American Guarantee & Liability Insurance Co.,* 391 U. S. 73 (1968), analogous to this case. In *Glona* the majority relied on Louisiana's "curious course" of sanctions against illegitimacy to demonstrate that there was no "rational basis" for prohibiting a mother from recovering for the wrongful death of her son. *Id.,* at 74–75. Even if we were to apply the "rational basis" test to the Louisiana intestate succession statute, that statute clearly has a rational basis in view of Louisiana's interest in promoting family life and of directing the disposition of property left within the State.

[7] La. Civ. Code Ann., Arts. 90–98 (1952).

[8] La. Civ. Code Ann., Arts. 119, 120 (1952).

[9] "Fathers and mothers, by the very act of marrying, contract together the obligation of supporting, maintaining, and educating their children." La. Civ. Code Ann., Art. 227 (1952). See n. 2, *supra.*

[10] La. Civ. Code Ann., Art. 229 (1952).

[11] La. Civ. Code Ann., Art. 915 (1952).

[12] La. Civ. Code Ann., Arts. 1493–1495 (1952).

Louisiana also has a complex set of rules regarding the rights of illegitimate children. Children born out of wedlock and who are never acknowledged by their parents apparently have no right to take property by intestate succession from their father's estate. In some instances, their father may not even bequeath property to them by will.[13] Illegitimate children acknowledged by their fathers are "natural children." Natural children can take from their father by intestate succession "to the exclusion only of the State." They may be bequeathed property by their father only to the extent of either one-third or one-fourth of his estate and then only if their father is not survived by legitimate children or their heirs.[14] Finally, children born out of wedlock can be legitimated or adopted, in which case they may take by intestate succession or by will as any other child.

These rules for intestate succession may or may not reflect the intent of particular parents. Many will think that it is unfortunate that the rules are so rigid. Others will think differently. But the choices reflected by the intestate succession statute are choices which it is within the power of the State to make. The Federal Constitution does not give this Court the power to overturn the State's choice under the guise of constitutional interpretation because the Justices of this Court believe that they can provide better rules. Of course, it may be said that the rules adopted by the Louisiana Legislature "discriminate" against illegitimates. But the rules also discriminate against collateral relations, as opposed to ascendants, and against ascendants, as opposed to descendants. Other rules determining property rights

---

[13] "Natural fathers and mothers can, in no case, dispose of property in favor of their adulterine or incestuous children, unless to the mere amount of what is necessary to their sustenance, or to procure them an occupation or profession by which to support themselves." La. Civ. Code Ann., Art. 1488 (1952).

[14] La. Civ. Code Ann., Art. 1486 (1952).

based on family status also "discriminate" in favor of wives and against "concubines." [15]   The dissent attempts to distinguish these other "discriminations" on the ground that they have a biological or social basis.   There is no biological difference between a wife and a concubine, nor does the Constitution require that there be such a difference before the State may assert its power to protect the wife and her children against the claims of a concubine and her children.   The social difference between a wife and a concubine is analogous to the difference between a legitimate and an illegitimate child.   One set of relationships is socially sanctioned, legally recognized, and gives rise to various rights and duties.   The other set of relationships is illicit and beyond the recognition of the law.   Similarly, the State does not need biological or social reasons for distinguishing between ascendants and descendants.   Some of these discriminatory choices are perhaps more closely connected to our conceptions of social justice or the ways in which most dying men wish to dispose of their property than the Louisiana rules governing illegitimate children. It may be possible that some of these choices are more "rational" than the choices inherent in Louisiana's categories of illegitimates.   But the power to make rules to establish, protect, and strengthen family life as well as to regulate the disposition of property left in Louisiana by a man dying there is committed by the Constitution of the United States and the people of Louisiana to the legislature of that State.   Absent a specific constitutional guarantee, it is for that legislature,

---

[15] "Those who have lived together in open concubinage are respectively incapable of making to each other, whether *inter vivos* or *mortis causa,* any donation of immovables; and if they make a donation of movables, it can not exceed one-tenth part of the whole value of their estate.

"Those who afterwards marry are excepted from this rule."   La. Civ. Code Ann., Art. 1481 (1952).

not the life-tenured judges of this Court, to select from among possible laws.[16] We cannot say that Louisiana's policy provides a perfect or even a desirable solution or the one we would have provided for the problem of the property rights of illegitimate children.[17] Neither can we say that Louisiana does not have the power to make laws for distribution of property left within the State.

We emphasize that this is not a case, like *Levy,* where the State has created an insurmountable barrier to this illegitimate child. There is not the slightest suggestion in this case that Louisiana has barred this illegitimate from inheriting from her father. Ezra Vincent could have left one-third of his property to his illegitimate daughter had he bothered to follow the simple formalities of executing a will. He could, of course, have legitimated the child by marrying her mother in which case the child could have inherited his property either by intestate succession or by will as any other legitimate child. Finally, he could have awarded his child the benefit of Louisiana's intestate succession statute on the same terms as legitimate children simply by stating in his acknowledgment of paternity his desire to legitimate the little girl. See *Bergeron v. Miller,* 230 So. 2d 417 (La. App. 1970).

In short, we conclude that in the circumstances presented in this case, there is nothing in the vague generalities of the Equal Protection and Due Process Clauses

---

[16] "Now the law in question is nothing more than an exercise of the power which every state and sovereignty possesses, of regulating the manner and term upon which property real or personal within its dominion may be transmitted by last will and testament, or by inheritance; and of prescribing who shall and who shall not be capable of taking it." *Mager v. Grima,* 8 How. 490, 493 (1850). See *Lyeth v. Hoey,* 305 U. S. 188, 193 (1938).

[17] See Krause, Bringing the Bastard into the Great Society—A Proposed Uniform Act on Legitimacy, 44 Tex. L. Rev. 829 (1966).

which empowers this Court to nullify the deliberate choices of the elected representatives of the people of Louisiana.

*Affirmed.*

MR. JUSTICE HARLAN, concurring.

In joining the opinion of the Court, I wish to add a few words, prompted, I may say, by the dissenting opinion, which in my view evinces extravagant notions of what constitutes a denial of "equal protection" in the constitutional sense.

It is surely entirely reasonable for Louisiana to provide that a man who has entered into a marital relationship thereby undertakes obligations to any resulting offspring beyond those which he owes to the products of a casual liaison, and this whether or not he admits the fact of fatherhood in the latter case.* With respect to a substantial portion of a man's estate, these greater obligations stemming from marriage are imposed by the provision of Louisiana law making a man's legitimate children his forced heirs. For the remainder of his estate, these obligations are not absolute, but are conditional upon his not disposing of his property in other ways. With all respect to my dissenting Brethren, I deem little short of frivolous the contention that the Equal Protection Clause prohibits enforcement of marital obligations, in either the mandatory or the suppletive form. See H. M. Hart & A. Sacks, The Legal Process: Basic Prob-

---

*Louisiana law authorizes illegitimate children to claim support not only from both parents but also from the parents' heirs. See *ante,* at 534 n. 2. It thus goes considerably beyond the common law and statutes generally in force at the time the Fourteenth Amendment was adopted. These rarely did more than authorize public officials to bring an action directing the putative father to support a child who threatened to become a public charge. See 2 Kent's Commentaries *215 and nn. (b) and (c) (12th ed. O. W. Holmes 1873).

lems in the Making and Application of Law 35–36, 251–256 (tent. ed. 1958).

In addition to imposing these obligations, Louisiana law prohibits testamentary dispositions to one's illegitimate children. Even were my dissenting Brethren prepared to hold this rule of law unconstitutional, to do so would not affect the outcome of this case. First, appellant's child is "natural" rather than "illegitimate"; and second, if the father desired her to have his property after his death, he did not manifest that desire in the appropriate way.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL join, dissenting.

In my view, Louisiana's intestate succession laws, insofar as they treat illegitimate children whose fathers have publicly acknowledged them differently from legitimate children, plainly violate the Equal Protection Clause of the Fourteenth Amendment. The Court today effectively concedes this, and, to reach its result, resorts to the startling measure of simply excluding such illegitimate children from the protection of the Clause, in order to uphold the untenable and discredited moral prejudice of bygone centuries which vindictively punished not only the illegitimates' parents, but also the hapless, and innocent, children. Based upon such a premise, today's decision cannot even pretend to be a principled decision. This is surprising from Justices who have heretofore so vigorously decried decisionmaking rested upon personal predilections, to borrow the Court's words, of "life-tenured judges of this Court." *Ante,* at 539. I respectfully dissent.

## I

In 1961, Ezra Vincent was 69 years old and Lou Bertha Patterson (now Lou Bertha Labine) was 41. They were unmarried adults living in rural, southwest Louisiana, outside the town of Lake Charles. Soon after meeting each other in 1961, Mrs. Patterson moved in with Mr. Vincent. Although they did not marry, Mrs. Patterson had a daughter by Mr. Vincent on March 15, 1962. The child's birth certificate identified the father and mother by name. Within two months, Mr. Vincent and Mrs. Patterson appeared before a notary public and executed a form, in accordance with Louisiana law, acknowledging that Mr. Vincent was the father of the child. A month later, the child's birth certificate was changed to give the child Mr. Vincent's name,[1] and she has always been known since as Rita Nell Vincent. By acknowledging the child, Mr. Vincent became legally obligated under state law to support her.[2] Mr. Vincent and Mrs. Patterson continued to live together and raise Rita Nell until Mr. Vincent died in 1968. He left no will.

As natural tutrix of Mr. Vincent's only child, Rita Nell's mother brought this suit on the child's behalf seeking to have Rita Nell declared Mr. Vincent's sole heir. Applying Louisiana law,[3] the trial court dismissed the action and declared Mr. Vincent's collateral relations—his brothers and sisters—to be his heirs.[4] The

---

[1] Louisiana law appears to direct that the birth certificate be changed only when the child has been legitimated. La. Rev. Stat. § 40:308 (1950).

[2] La. Civ. Code Ann., Art. 242 (1952).

[3] See Part II, *infra*.

[4] In addition, the trial court, despite uncontradicted testimony that the child required $192 per month for support, rejected the claim for alimony from her father's estate, as provided in Louisiana

child's tutrix appealed, arguing that to treat a publicly acknowledged illegitimate child differently from a legitimate child was a denial of equal protection and due process. The Louisiana intermediate appellate court affirmed in all respects, upholding the state statutory provisions against constitutional attack, "[h]owever unfair it may be to punish innocent children for the fault of their parents." 229 So. 2d 449, 452 (1969). The Louisiana Supreme Court declined review, and we noted probable jurisdiction. 400 U. S. 817 (1970).

## II

The rationality and constitutionality of Louisiana's treatment of the illegitimate child can only be analyzed against the background of a proper understanding of that State's law. Under Louisiana law, legitimate children have an automatic right to inherit from their parents.[5] Legitimate children generally cannot be disinherited.[6]

---

law, La. Civ. Code Ann., Arts. 240–242, 243, 919 (1952), on the ground that the child was receiving $100 per month in Social Security and Veterans Administration benefits.

[5] La. Civ. Code Ann., Art. 1495 (1952), provides:

"In the cases prescribed by the two last preceding articles [legitimate children and parents], the heirs are called *forced heirs*, because the donor can not deprive them of the portion of *his* estate reserved for them by law, except in cases where he has a just cause to disinherit them." (Emphasis in original.)

[6] *Ibid.* A parent can only disinherit a legitimate child if the parent alleges a certain statutorily defined "just cause" in his will and in terms expresses his desire to disinherit the child. La. Civ. Code Ann., Arts. 1617–1620 (1952). Article 1621 of the Louisiana Civil Code specifies the "just causes" for which disinherison is permitted:

"The just causes for which parents may disinherit their children are ten in number, to wit:

"1. If the child has raised his or her hand to strike the parent, or

Property cannot even be given away without taking account of the rights of a legitimate child, since the portion of the decedent's estate that can be given away or disposed of through donations *inter vivos* or *mortis causa* is sharply limited by law for the benefit of a person's legitimate children.[7] Actually the Louisiana Constitution protects this scheme of forced heirship which benefits the decedent's parents as well as his legitimate children.[8]

---

if he or she has actually struck the parent; but a mere threat is not sufficient.

"2. If the child has been guilty, towards a parent, of cruelty, of a crime or grievous injury.

"3. If the child has attempted to take the life of either parent.

"4. If the child has accused a parent of any capital crime, except, however, that of high treason.

"5. If the child has refused sustenance to a parent, having means to afford it.

"6. If the child has neglected to take care of a parent become insane.

"7. If the child refused to ransom them, when detained in captivity.

"8. If the child used any act of violence or coercion to hinder a parent from making a will.

"9. If the child has refused to become security for a parent, having the means, in order to take him out of prison.

"10. If the son or daughter, being a minor, marries without the consent of his or her parents."

The persons seeking to take against the disinherited forced heir must prove the truth of the "just cause" alleged in the parent's will. *Pennywell* v. *George*, 164 La. 630, 114 So. 493 (1927). Disinherison is not favored. *Succession of Reems*, 134 La. 1033, 64 So. 898 (1914).

[7] La. Civ. Code Ann., Art. 1493 (1952), provides, in pertinent part:

"Donations *inter vivos* or *mortis causa* can not exceed two-thirds of the property of the disposer, if he leaves, at his decease, a legitimate child; one-half, if he leaves two children; and one-third, if he leaves three or a greater number."

See generally La. Civ. Code Ann., Arts. 1493–1518 (1952).

[8] La. Const., Art. 4, § 16 (1921).

This enshrinement of forced heirship in the state constitution symbolizes Louisiana's extensive legal ordering of familial affairs. Louisiana's regulation of the family covers not merely the devolution of property upon the death of any member, but virtually every aspect of the duties owed by one family member to another, and the authority, particularly of the father, over the other members.[9] This reflects the derivation of Louisiana's legal traditions from the French, Spanish, and Roman civil law; they do not have their roots in English common law:

> "Countries which received the Roman law in one form or another have traditionally ordered relationships between citizens in terms of two institutions, family and obligation. . . . [T]he relationships formed by Romanist man were all grounded in one or both of these institutions. *His relationship with his family was determined by law,* it established his status, and this, in turn, qualified the relationships which he could make with those who were not his family. . . . [A] man's position within his family passed into the modern Roman law as the significant qualification to forming private legal relationships." Tucker, Sources of Louisiana's Law of Persons: Blackstone, Domat, and the French Codes, 44 Tul. L. Rev. 264, 275–276 (1970) (emphasis added).[10]

Thus it is that Louisiana law distinguishes between legitimate children and illegitimate children throughout that law's extensive regulation of family affairs.[11] But, for purposes of this case, I need only discuss those portions of Louisiana law that bear upon inheritance rights.

---

[9] See, *e. g.,* La. Civ. Code Ann., Arts. 215–237 (1952).

[10] See generally Pelletier & Sonnenreich, A Comparative Analysis of Civil Law Succession, 11 Vill. L. Rev. 323 (1966).

[11] See, *e. g.,* La. Civ. Code Ann., Arts. 215–245 (1952).

Article 178 of the Louisiana Civil Code provides in full: "Children are either legitimate, illegitimate, or legitimated." Not all illegitimate children can be legitimated, however—only those whose parents do not have legitimate descendants or ascendants and could lawfully have married each other at the time of the child's conception, or those whose parents later marry can be legitimated.[12] An illegitimate child who can be legitimated becomes a "natural" child when his father formally acknowledges him. However, Article 206 of the Louisiana Civil Code provides that, "[i]llegitimate children, though duly acknowledged, can not claim the rights of legitimate children." Thus, the primary consequence under Louisiana succession law that flows from acknowledgment is that the natural child may inherit under a will, and inherits if there is no will, only after the father's other descendants, ascendants, collateral relations, and surviving spouse, but before the estate escheats to the State.[13] An illegitimate child whose parents could lawfully have married each other at the time of the child's conception, but who has

---

[12] La. Civ. Code Ann., Art. 200 (1952), provides:

"A natural father or mother shall have the power to legitimate his or her natural children by an act passed before a notary and two witnesses, declaring that it is the intention of the parent making the declaration to legitimate such child or children. *But only those natural children can be legitimated who are the offspring of parents who, at the time of conception, could have contracted marriage. Nor can a parent legitimate his or her natural offspring in the manner prescribed in this article, when there exists on the part of such parent legitimate ascendants or descendants.*" (Emphasis added.)

La. Civ. Code Ann., Art. 198 (1952), provides:

"Children born out of marriage, except those who are born from an incestuous connection, are legitimated by the subsequent marriage of their father and mother, whenever the latter have formally or informally acknowledged them for their children, either before or after the marriage."

[13] See Oppenheim, Acknowledgment and Legitimation in Louisiana—Louisiana Act 50 of 1944, 19 Tul. L. Rev. 325, 327 (1945).

not been publicly acknowledged, or an illegitimate child whose parents were not capable of marriage at the time of conception, may not inherit *at all,* either by will or intestate succession, "the law allowing them nothing more than a mere alimony." La. Civ. Code Ann., Art. 920 (1952).[14]

## III

Under Louisiana law a legitimate child would have had an absolute right to inherit Mr. Vincent's estate; Mr. Vincent could not have totally disinherited such a child. This is a consequence of Louisiana's "forced heirship" law, in other words a consequence of a state decision, however contrary that might be to Mr. Vincent's own desires. Similarly in the present case, Mr. Vincent's illegitimate daughter, though duly acknowledged, is denied his intestate estate, not because he wished that result but because the State places her behind Mr. Vincent's collateral relations—indeed behind all his relations—in the line of succession.

The State's discrimination is clear and obvious.[15] Ordinarily, even in cases of economic regulation, this

---

[14] See *Succession of Elmore,* 124 La. 91, 49 So. 989 (1909).

[15] As Part II of this opinion makes clear, only parents of illegitimate children who could have married at the time of conception and who have no legitimate ascendants or descendants may legitimate those children by notarial act. See n. 12, *supra.* The Court relies on the fact that Mr. Vincent was within this narrow class of fathers of illegitimate children to suggest that Louisiana law allows fathers to decide whether or not their illegitimate children will inherit the father's estate. *Ante,* at 539. Even as to this class, however, Louisiana law places the burden on the father of a publicly acknowledged illegitimate child to take affirmative action to *inherit* that child, while virtually disabling the same father from disinheriting a legitimate child, or, at least, placing a burden of affirmative action on the father in order to *disinherit* the legitimate child. Thus, even as to this small group, the discrimination imposed by the State is clear.

Court will inquire, under the Equal Protection Clause of the Fourteenth Amendment, whether there is some "reasonable basis" for a discrimination in a state statute, or whether the discrimination is invidious. *E. g., Morey* v. *Doud,* 354 U. S. 457 (1957); *Williamson* v. *Lee Optical Co.,* 348 U. S. 483 (1955); *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886). Such an inquiry does not question the State's *power* to regulate; rather, it focuses exclusively on whether the State has legislated without the invidious discrimination that is forbidden by the Fourteenth Amendment.

For reasons not articulated, the Court refuses to consider in this case whether there is any reason at all, or any basis whatever, for the difference in treatment that Louisiana accords to publicly acknowledged illegitimates and to legitimate children. Rather, the Court simply asserts that "the power to make rules to establish, protect, and strengthen family life as well as to regulate the disposition of property left in Louisiana by a man dying there is committed by the Constitution of the United States and the people of Louisiana to the legislature of that State." *Ante,* at 538. But no one questions Louisiana's power to pass inheritance laws.[16] Surely the Court

---

[16] The only context in which this statement might have relevance would be in the context of the question, not presented in this case, of the power of Congress to regulate the devolution of property upon the death of citizens of the various States. In such a case, the question would indeed be whether the Constitution commits such power exclusively to the States. It so happens that this Court, in an opinion written by my Brother BLACK, has held that the Constitution does *not* commit the power to regulate intestate succession exclusively to the States. *United States* v. *Oregon,* 366 U. S. 643, 649 (1961) ("The fact that this [federal] law pertains to the devolution of property does not render it invalid. Although it is true that this is an area normally left to the States, it is not immune under the Tenth Amendment from laws passed by the Federal Government which are, as is the law here, necessary and proper to the exercise of a delegated power.").

cannot be saying that the Fourteenth Amendment's Equal Protection Clause is inapplicable to subjects regulable by the States—that extraordinary proposition would reverse a century of constitutional adjudication under the Equal Protection and Due Process Clauses. It is precisely state action which is subjected by the Fourteenth Amendment to its restraints. It is, to say the least, bewildering that a Court that for decades has wrestled with the nuances of the concept of "state action" in order to ascertain the reach of the Fourteenth Amendment, in this case holds that the state action here, because it is state action, is insulated from these restraints.

Putting aside the Court's repeated emphasis on Louisiana's power to regulate intestate succession—something not questioned and wholly irrelevant to the present constitutional issue—only two passages in the Court's opinion even attempt an argument in support of today's result. First, the Court tells us that Louisiana intestate succession law favors some classes of a deceased's relatives over other classes. That is certainly true, but the Court nowhere suggests what bearing these other discriminations have on the rationality of Louisiana's discrimination against the acknowledged illegitimate. It is a little like answering a complaint of Negro school children against separate lavatories for Negro and white students by arguing that the situation is no different from separate lavatories for boys and girls, or for elementary school children and high school students. These other discriminations may be rational or irrational. But their only relevance to the rationality and constitutionality of the specific challenged discrimination is the light they throw, if any, on the basis for that discrimination. The conclusion the Court appears to draw from its itemization of other discriminations among a de-

ceased's relatives is that Louisiana needs *no* justification at all for any of the distinctions it draws. That reasoning flies in the face not only of the Equal Protection and Due Process Clauses of the Fourteenth Amendment, but also of the very notion of a rule of law.

The only other hint at an attempt to support today's result may appear in the purported distinction of *Levy* v. *Louisiana*, 391 U. S. 68 (1968): "We emphasize that this is not a case, like *Levy*, where the State has created an insurmountable barrier to this illegitimate child." *Ante*, at 539. There may be two implications in this statement: (1) that in *Levy*, there was an insurmountable barrier to recovery; and (2) that any discrimination that falls short of an "insurmountable barrier" is, without need for further analysis, permissible. As to the first, *Levy* involved an unacknowledged illegitimate child. Louisiana permitted an illegitimate child to recover in tort for the death of the child's mother, under the State's wrongful death act, only if the illegitimate child had been acknowledged. There was no insurmountable barrier to the child's recovery; if the mother had formally acknowledged the child, recovery would have been permitted. My Brother HARLAN's dissent emphasized this fact and argued that the State was entitled to rely on specified formalities. Plainly then *Levy* did not involve any "insurmountable barrier."

The Court's second implication—that any discrimination short of an "insurmountable barrier" is permissible—is one of those propositions the mere statement of which is its own refutation. *Levy*, as I have pointed out, holds squarely to the contrary specifically in the context of discrimination against illegitimate children. And numerous other cases in this Court establish the general proposition that discriminations that "merely" disadvantage a class of persons or businesses are as subject to

the command of the Fourteenth Amendment as discriminations that are in some sense more absolute.[17]

In short, the Court has not analyzed, or perhaps simply refuses to analyze, Louisiana's discrimination against acknowledged illegitimates in terms of the requirements of the Fourteenth Amendment.[18] Since I still believe that the Constitution does prohibit a State from denying any person the "equal protection of the laws," I must therefore undertake my own analysis to determine, at a minimum, whether there is any rational basis for the discrimination, or whether the classification bears any intelligible proper relationship to the consequences that flow from it.[19] See, *e. g., Dandridge* v. *Williams,* 397 U. S. 471 (1970); *McLaughlin* v. *Florida,* 379 U. S. 184,

[17] *E. g., Dandridge* v. *Williams,* 397 U. S. 471 (1970); *Morey* v. *Doud, supra; Hunter* v. *Erickson,* 393 U. S. 385 (1969); *Douglas* v. *California,* 372 U. S. 353 (1963); *Smith* v. *Cahoon,* 283 U. S. 553 (1931). Cf. *Plessy* v. *Ferguson,* 163 U. S. 537 (1896); *Brown* v. *Board of Education,* 347 U. S. 483 (1954).

[18] In one sentence in a footnote, the Court says, "Even if we were to apply the 'rational basis' test to the Louisiana intestate succession statute, that statute clearly has a rational basis in view of Louisiana's interest in promoting family life and of directing the disposition of property left within the State." *Ante,* at 536 n. 6. I agree that Louisiana has an interest in promoting family life and in directing the disposition of property left within the State. I do not understand how either of these interests provides any basis for Louisiana's discrimination against the acknowledged illegitimate, and the Court does not explain the relevance of these state interests.

[19] In view of my conclusion that the present discrimination cannot stand even under the "some rational basis" standard, I need not reach the questions whether illegitimacy is a "suspect" classification that the State could not adopt in any circumstances without showing a compelling state interest, or whether fundamental rights are involved, which also would require a showing of a compelling state interest. See *Levy* v. *Louisiana,* 391 U. S. 68, 71 (1968); *Harper* v. *Virginia Board of Elections,* 383 U. S. 663 (1966); *Skinner* v. *Oklahoma,* 316 U. S. 535 (1942). This Court has generally treated as suspect a classification that discriminates against an individual on the basis of factors over which he has no control.

190–191 (1964); *Morey* v. *Doud, supra; Gulf, C. & S. F. R. Co.* v. *Ellis,* 165 U. S. 150, 155 (1897).

Certainly, there is no biological basis for the State's distinction. Mr. Vincent's illegitimate daughter is related to him biologically in exactly the same way as a legitimate child would have been. Indeed, it is the identity of interest "in the biological and in the spiritual sense," *Levy* v. *Louisiana,* 391 U. S., at 72, and the identical "intimate, familial relationship," *id.,* at 71, between both the legitimate and illegitimate child, and their father, which is the very basis for appellant's contention that the two must be treated alike.

Louisiana might be thought to have an interest in requiring people to go through certain formalities in order to eliminate complicated questions of proof and the opportunity for both error and fraud in determining paternity after the death of the father. This argument, of course, was the focal point of the dissent in *Levy* and *Glona* v. *American Guarantee & Liability Insurance Co.,* 391 U. S. 73 (1968). I leave aside, for the moment, the fact that the holdings of those two cases indicate that this consideration is insufficient to justify a difference in treatment when there is no dispute over the fact of parentage. For my Brother HARLAN's dissenting opinion in those cases explicitly recognized that the State's interest in this regard is fully satisfied by a formal public acknowledgment. 391 U. S., at 80. When a father has formally acknowledged his child or gone through any state authorized formality for declaring paternity, or when there has been a court judgment of paternity, there is no possible difficulty of proof, and no opportunity for fraud or error. This purported interest certainly can offer no justification for distinguishing between a formally acknowledged illegitimate child and a legitimate one.

It is also important not to obscure the fact that the formality of marriage primarily signifies a relationship

between husband and wife, not between parent and child. Analysis of the rationality of any state effort to impose obligations based upon the fact of marriage must, therefore, distinguish between those obligations that run between parties to the marriage and those that run to others. My Brother HARLAN, unlike his colleagues in the majority, concedes that the Equal Protection Clause requires a justification for Louisiana's discrimination against illegitimates, and he attempts one; he argues that it is reasonable for a State to impose greater obligations on a man in respect to his wife and their children than in respect to other women and any other children of whom he may be the father. In other words, contrary to the Louisiana court below, he apparently believes that Louisiana's discrimination against illegitimates reflects a state policy that would discourage marriage by imposing special burdens, such as those of forced heirship, upon those who enter into it. However that may be, such force as his argument may have stems directly from its lack of specificity. Imposition by a State of reciprocal obligations upon husband and wife that are not imposed upon those who do not enter into a formalized marriage relationship is based upon the assumptions (1) that marriage may be promoted through pressure applied on or by the party seeking the benefit of obligations imposed by the married status, and (2) that in any event the choice is entirely within the control of the two individuals concerned. These elements are entirely lacking when we consider the relationship of a child *vis-à-vis* its parents. Precisely this point was made approvingly by Chancellor Kent, relied upon by my Brother HARLAN, early in the 19th century:

> "This relaxation in the laws of so many of the states, of the severity of the common law [discrimina-

tion against illegitimates], rests upon the principle that the relation of parent and child, which exists in this unhappy case, in all its native and binding force, ought to produce the ordinary legal consequences of that consanguinity." 2 J. Kent, Commentaries *213 (12th ed. O. Holmes 1873).[20]

Intestate succession laws might seek to carry out a general intent of parents not to provide for publicly acknowledged illegitimate children. However, as the summary of Louisiana law I have made shows, one of the primary hallmarks of Louisiana's civil code is its detailed, extensive regulation of the family relationship. Its discrimination against the illegitimate in matters of inheritance and succession is official state policy, completely negating any argument that such discrimination merely represents a legislative judgment about the probable wishes of a deceased or the desires of most persons in similar situations. The opinion of the state court below itself eliminates that possibility. The Louisiana court

---

[20] The concurring opinion suggests that the legal obligation to support the illegitimate child imposed by Louisiana law goes "considerably beyond the common law and statutes generally in force at the time the Fourteenth Amendment was adopted." *Ante,* at 540 n. The authority cited by the concurrence for this proposition describes early 19th century American law on the subject as follows: "The mother, or reputed father, is generally in this country chargeable by law with the maintenance of the bastard child; and in New York it is in such way as any two justices of the peace of the county shall think meet; and the goods, chattels, and real estate of the parents are seizable for the support of such children, if the parents have absconded. The reputed father is liable to arrest and imprisonment until he gives security to indemnify the town chargeable with the maintenance of the child. These provisions are intended for the public indemnity, and were borrowed from the several English statutes on the subject; and similar regulations to coerce the putative father to maintain the child, and indemnify the town or parish, have been adopted in the several states." 2 J. Kent, Commentaries *215 (12th ed. O. Holmes 1873).

affirmatively states that the disinheritance of acknowledged illegitimates is in furtherance of specific state policy goals—goals that are unrelated to parents' intentions. 229 So. 2d, at 452. Finally, viewing the general statutory treatment of illegitimates as a whole, particularly the facts that only a narrow class of fathers can legitimate their children by declaration, and that unacknowledged and "adulterous" illegitimates are prohibited from inheriting even by will, I think the conclusion is compelled that Louisiana's discrimination represents state policy, not an attempt to aid in the effectuation of private desires.

Even if Louisiana law could be read as being based on a legislative judgment about parents' intent, the present discrimination against illegitimates could not stand. In order to justify a discrimination on the ground that it reflects a legislative judgment about the desires of most persons in similar situations, there must be some rational basis [21] for finding that the legislative classification does reflect those persons' desires or intentions as a general matter. The Court makes no argument that fathers who have publicly acknowledged their illegitimate children generally intend to disinherit them. No Louisiana court opinion or Louisiana legislative pronouncement that I can discover, or the Attorney General of Louisiana in this case, has ever argued that the Louisiana scheme reflects the general intentions of fathers of illegitimate children in that State. Indeed, the state court below justified the discrimination on the ground that "the denial of inheritance rights to illegitimates might reasonably be viewed as encouraging marriage and legitimation of children." 229 So. 2d, at 452. Such denial could encourage marriage only if fathers generally desire to leave their property to their illegitimate children; otherwise, disin-

---

[21] But see n. 19, *supra*.

heritance would not operate as a sanction to encourage marriage.

Moreover, logic and common experience also suggest that a father who has publicly acknowledged his illegitimate child will *not* generally intend to disinherit his child. A man who publicly announces that he has fathered a child out of wedlock has publicly claimed that child for his own. He has risked public opprobrium, or other sanctions, to make the public announcement. Surely, it does not follow that he will generally desire to disinherit that child and further discredit his reputation by refusing to contribute to his own child at death. All the writings cited to us, including a United Nations study report,[22] an English study commission,[23] the proposed Uniform Probate Code,[24] and a variety of law review commentary in this country,[25] suggest precisely the opposite conclusion. Moreover, Louisiana is the only State in the country that denies illegitimate children rights of inheritance from the mother equal to those of

---

[22] Subcommission on Prevention of Discrimination and Protection of Minorities of the Commission on Human Rights, United Nations Economic and Social Council, Study of Discrimination against Persons Born Out of Wedlock: General Principles on Equality and Non-Discrimination in Respect of Persons Born out of Wedlock, U. N. Doc. E/CN. 4 Sub. 2/L 453 (Jan. 13, 1967).

[23] Stone, Report of the Committee on the Law of Succession in Relation to Illegitimate Persons, 30 Mod. L. Rev. 552 (1967).

[24] National Conference of Commissioners on Uniform State Laws, Uniform Probate Code § 2–109 (official text 1969).

[25] Note, Illegitimacy, 26 Brooklyn L. Rev. 45 (1959); Krause, Equal Protection for the Illegitimate, 65 Mich. L. Rev. 477 (1967); Krause, Bringing the Bastard into the Great Society—A Proposed Uniform Act on Legitimacy, 44 Tex. L. Rev. 829 (1966); Gray & Rudovsky, The Court Acknowledges the Illegitimate: *Levy* v. *Louisiana* and *Glona* v. *American Guarantee & Liability Insurance Co.*, 118 U. Pa. L. Rev. 1 (1969); Note, The Rights of Illegitimates Under Federal Statutes, 76 Harv. L. Rev. 337 (1962).

legitimate children,[26] and one of only four States that have expressly provided by statute that the illegitimate child may not inherit from his father.[27]    The legislatures of 20 States by statute allow acknowledged illegitimate children to inherit equally from their fathers.[28]    Three States grant equal rights of inheritance from the father regardless of acknowledgment.[29]    The legislatures of the other 23 States have not passed upon the question.

The Court nowhere mentions the central reality of this case: Louisiana punishes illegitimate children for the misdeeds of their parents.   The judges of the Third Circuit Court of Appeal of Louisiana, whose judgment the Court here reviews, upheld the present discrimination "[h]owever unfair it may be to punish innocent children for the fault of their parents . . . ."   229 So. 2d, at 452. It is certainly unusual in this country for a person to be legally disadvantaged on the basis of factors over which

---

[26] See the table summarizing state statutes in Note, Illegitimacy, 26 Brooklyn L. Rev. 45, 76–79 (1959).   In 1959, New York as well as Louisiana did not allow illegitimate children to inherit equally from their mothers.   New York has since changed its law.   N. Y. Est., Powers & Trusts Law § 4–1.2 (a) (1) (1967).

[27] Hawaii Rev. Laws § 577–14 (1968); Ky. Rev. Stat. § 391.090 (1962); Pa. Stat. Ann., Tit. 20, § 1.7 (1950).

[28] Cal. Prob. Code § 255 (Supp. 1971); Colo. Rev. Stat. Ann. § 153–2–8 (1963); Fla. Stat. § 731.29 (1965); Ga. Code Ann. § 74–103 (1964); Idaho Code § 14–104 (1947); Ind. Ann. Stat. § 6–207 (1953) [adjudication of paternity required]; Iowa Code § 633.222 (1971); Kan. Stat. Ann. § 59–501 (1964); Mich. Stat. Ann. § 27.3178 (153) (Supp. 1970); Minn. Stat. § 525.172 (1967); Mont. Rev. Codes Ann. § 91–404 (1964); Neb. Rev. Stat. § 30–109 (1964); Nev. Rev. Stat. § 134.170 (1967); N. M. Stat. Ann. § 29–1–18 (1953); N. Y. Est., Powers & Trusts Law § 4–1.2 (1967) [order of filiation required]; Okla. Stat. Ann., Tit. 84, § 215 (1970); S. D. Compiled Laws Ann. § 29–1–15 (1967); Utah Code Ann. § 74–4–10 (1953); Wash. Rev. Code § 11.04.081 (1967); Wis. Stat. Ann. § 237.06 (Supp. 1970).

[29] Ariz. Rev. Stat. Ann. § 14–206 (1956); N. D. Cent. Code § 56–01–05 (Supp. 1969); Ore. Rev. Stat. §§ 111.231, 109.060 (1957).

he never had any control. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi* v. *United States,* 320 U. S. 81, 100 (1943). The state court below explicitly upheld the statute on the ground that the punishment of the child might encourage the parents to marry.[30] If that is the State's objective, it can obviously be attained far more directly by focusing on the parents whose actions the State seeks to influence. Given the importance and nature of the decision to marry, cf. *Boddie* v. *Connecticut, ante,* p. 371, I think that disinheriting the illegitimate child must be held to "bear no intelligible proper relation to the consequences that are made to flow" from the State's classification. *Glona* v. *American Guarantee & Liability Insurance Co.,* 391 U. S., at 81 (HARLAN, J., dissenting).

In my judgment, only a moral prejudice, prevalent in 1825 when the Louisiana statutes under consideration were adopted, can support Louisiana's discrimination against illegitimate children. Since I can find no rational basis to justify the distinction Louisiana creates between an acknowledged illegitimate child and a legitimate one, that discrimination is clearly invidious.[31] *Morey* v. *Doud,* 354 U. S. 457 (1957). I think the Supreme Court of North Dakota stated the correct principle in invalidat-

---

[30] The state court also argued that Louisiana's disinheritance of the illegitimate would serve the State's interest in the stability of land titles, by avoiding "the disruptions and uncertainties to result from unknown and not easily ascertained claims through averments of parentage . . . ." 229 So. 2d, at 452. This is simply a variation on the State's interest in relying on formalities, see *supra,* at 552, which is completely served by public acknowledgment of parentage and simply does not apply to the case of acknowledged illegitimate children.

[31] See n. 19, *supra.*

ing an analogous discrimination in that State's inheritance laws: "This statute, which punishes innocent children for their parents' transgressions, has no place in our system of government, which has as one of its basic tenets equal protection for all." *In re Estate of Jensen,* 162 N. W. 2d 861, 878 (1968).