**Karl J. KIRCHBERG**

v.

**Joan Paillot FEENSTRA et al.**

**Civ. A. No. 76–842.**

United States District Court,
E. D. Louisiana.

April 21, 1977.

---

William R. Brough, New Orleans, La., for plaintiff.

Barbara Hausman-Smith, Jack Mark Stolier, George M. Strickler, Jr., New Orleans, La., for defendant.

## ORDER

SEAR, District Judge:

A hearing was held on a prior day on the motion of the State of Louisiana for summary judgment on the second counterclaim of Joan P. Feenstra. Following oral argument and the submission of additional memoranda, the matter was taken under submission.

The facts are not in dispute. Defendant and plaintiff in counterclaim, Joan P. Feenstra, filed state criminal charges against her husband Harold C. Feenstra in October, 1974. While incarcerated on that charge, Feenstra hired Karl J. Kirchberg, attorney at law, plaintiff and defendant in counterclaim, to represent him in connection with the criminal charge. In payment of Kirchberg's legal fees, Feenstra executed a promissory note dated October 17, 1974 for $3,000.00 payable to the order of Kirchberg with interest at the rate of 8% per annum. The note provided for attorney's fees in case payment was not timely made. On October 22, 1974, Feenstra executed an act of mortgage on his family home as security for the promissory note he had issued to Kirchberg. The home was the community property of the Feenstras and title was held in the name of both spouses.

Ms. Feenstra was unaware that her husband had mortgaged their home until February, 1976, when, after default on the mortgage, Kirchberg instituted foreclosure proceedings in state court. Ms. Feenstra opposed the foreclosure, contending that Kirchberg had violated the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* Thereafter, Kirchberg instituted this proceeding for declaratory judgment that he had not violated the Act. Ms. Feenstra counterclaimed and seeks a declaratory judgment (a) that Kirchberg had violated the Act, and (b) that the provision of Louisiana law which permitted Feenstra to mortgage their home without her knowledge or consent violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment. The State of Louisiana was made a third party defendant on Feenstra's second counterclaim. Cross motions on the issues addressed to the Truth in Lending Act were previously denied; we now consider the Fourteenth Amendment question.

The provision of Louisiana law that Ms. Feenstra contests as unconstitutional is Louisiana Civil Code article 2334 which since this suit was filed has been amended and the provision which Ms. Feenstra finds objectionable changed.[1] The amendment, however, did not become effective until January 1, 1977, so it has no effect on this case. Article 2334 before its amendment provided:

"The property of married persons is divided into separate and common property.

"Separate property is that which either party brings into the marriage, or acquires during the marriage with separate funds, or by inheritance, or by donation made to him or her particularly.

"The earnings of the wife when living separate and apart from her husband al-

---

1. La.Civil Code art. 2334, as amended by La. Acts 1976, No. 679, now provides:

"Where the title to immovable property stands in the names of both the husband and wife, it may not be leased, mortgaged or sold by the husband without the wife's written authority or consent."

though not separated by judgment of court, her earnings when carrying on a business, trade, occupation or industry separate from her husband, actions for damages resulting from offenses and quasi offenses and the property purchased with all funds thus derived, are her separate property.

"Actions for damages resulting from offenses and quasi offenses suffered by the husband, living separate and apart from his wife, by reason of fault on her part, sufficient for separation or divorce shall be his separate property.

"Common property is that which is acquired by the husband and wife during marriage, in any manner different from that above declared. But when the title to community property stands in the name of the wife, it cannot be mortgaged or sold by the husband without her written authority or consent.

"Where the title to immovable property stands in the names of both the husband and wife, it may not be leased, mortgaged or sold by the husband without the wife's written authority or consent where she has made a declaration by authentic act that her authority and consent are required for such lease, sale or mortgage and has filed such declaration in the mortgage and conveyance records of the parish in which the property is situated."

Ms. Feenstra challenges the last paragraph of the article, which prohibited the husband from leasing, selling, or mortgaging community immovables when the wife had filed the declaration described. She contends that to require the wife to file such a declaration to protect her property interests, when the husband need not, violates the Equal Protection and Due Process Clause of the Fourteenth Amendment.[2]

The Court considered the issues raised by Ms. Feenstra were of a nature that the

civilian academicians might want to express their views and accordingly invited the four Louisiana law schools, the Louisiana Law Institute and the Louisiana State Bar Association to file amicus curiae briefs. None accepted the invitation.

Equity would seem to require that the complaint here presented be resolved in favor of the wife whose husband mortgaged her home to raise funds for the defense of criminal charges brought against him by the wife and who then defaulted on the obligation which it secured. But at stake here is the bedrock of Louisiana's community property system.

We believe that Ms. Feenstra's complaint is not so much with the last paragraph of former article 2334, but with the general power which remains unchanged by the 1976 amendment to article 2334 of the husband to administer community property as head and master of the community as described in La.Civil Code art. 2402:

"The husband is the head and master of the partnership or community of gains; he administers its effects, disposes of the revenues which they produce, and *may alienate them by an onerous title, without the consent and permission of his wife.*" (emphasis supplied)

The power of the husband to alienate was without limitation until 1912 when article 2334 was amended by La.Acts 1912, No. 170 to require the wife's written authority or consent for the husband to sell community property standing in the name of the wife alone. It was not until 1962, that the last paragraph of article 2334 was added [3] to restrict the husband's power to alienate community immovables standing in the names of both spouses. The constitutional attack on the last paragraph of article 2334 is, we believe, somewhat misplaced; if it were not for that paragraph, the husband would have unhindered power to alienate

---

**2.** Although article 2334 has been challenged on both equal protection and due process grounds, in practical terms these are merely opposite sides of the same issue. It is the alleged denial of due process under article 2334 which gives rise to the equal protection claim. *See e. g., Stanley v. Illinois,* 1972, 405 U.S. 645, 92 S.Ct.

1208, 31 L.Ed.2d 551. We apply, therefore, an equal protection approach to the problem.

**3.** La.Acts 1962, No. 353. The 1976 amendment to article 2334 restricts the husband's powers even more.

community immovables standing in the names of both the husband and wife. Therefore, we consider that Ms. Feenstra's challenge is to the operation of both articles 2404 and 2334.

Equal protection analysis of alleged sex-based discrimination must necessarily begin with *Reed v. Reed*, 1971, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 which involved a successful equal protection attack on an Idaho statute which preferred males over females in the selection of estate administrators when both were of equal entitlement otherwise. In discussing the Equal Protection Clause, the Court stated:

"In applying that clause, this Court has consistently recognized that the Fourteenth Amendment does not deny the power to States to treat different classes of persons in different ways. The Equal Protection Clause of that amendment does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'"

404 U.S. at 75–76, 92 S.Ct. at 253–54, 30 L.Ed.2d at 229 (citations omitted).

The Court found that the object of the statute, which was "to eliminate one area of controversy" where two or more persons are equally entitled to be named administrator and thus reduce the workload of the probate court, was a legitimate state interest, but held that statute failed to advance that objective "in a manner consistent with the command of the Equal Protection Clause."

*Reed* was applied by the Supreme Court two years later in *Frontiero v. Richardson*, 1973, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583. The Court there struck down a federal statute which permitted a serviceman to claim his wife as a dependent for purposes of air force benefits without regard to whether she was actually dependent on him, but required that a servicewoman demonstrate her husband's dependency before claiming the benefits. A four vote plurality concluded that "classifications based upon sex, like classifications based upon race, alienage, or national origin, are inherently suspect, and must therefore be subjected to strict judicial scrutiny". 411 U.S. at 688, 93 S.Ct. at 1771, 36 L.Ed.2d at 592.

A majority of the Supreme Court has never adopted the position that classification based on sex is inherently suspect, and the lower courts have read *Reed* and *Frontiero* as establishing a middle ground: "A classification based upon sex is less that suspect; a validating relationship must be more than minimal. What emerges is an 'intermediate approach' between rational basis and compelling interest." *Eslinger v. Thomas*, 4 Cir. 1973, 476 F.2d 225, 230–31.

Were we dealing with a statute preferring males over females in the selection of estate administrators or one making it easier for males than females to obtain governmental benefits, we would agree that the *Reed-Frontiero* test would require a finding of equal protection denial. In this case, however, we are faced with an entirely different situation, one in which such an analysis would be inappropriate. As discussed above, the last paragraph of article 2334 must be read in conjunction with the head and master provision of article 2404. Together, these articles constitute an integral part of the Louisiana community property system; they define the rights of husband and wife to deal with property owned by the community.

The regulation of property rights, especially between husband and wife, are peculiarly matters of State interest and concern. This was recognized by the United States Supreme Court in *Labine v. Vincent*, 1971, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288, in which the Court rejected an equal protection and due process attack on a Louisiana succession statute which precluded illegitimates, although duly acknowledged, from

claiming the inheritance rights of legitimates. In declining to apply the traditional rational basis test to the statute,[4] the Court, through Mr. Justice Black, provided a discussion of Louisiana property rights, much of which is appropriate here:

> "The people of Louisiana, through their legislature have carefully regulated many of the property rights incident to family life. Louisiana law prescribes certain formalities requisite to the contracting of marriage. Once marriage is contracted there, husbands have obligations to their wives. Fathers have obligations to their children. Should the children prosper while the parents fall upon hard times, children have a statutory obligation to support their parents. To further strengthen and preserve family ties, Louisiana regulates the disposition of property upon the death of a family man. The surviving spouse is entitled to an interest in the deceased spouse's estate. Legitimate children have a right of forced heirship in their father's estate and can even retrieve property transferred by their father during his lifetime in reduction of their rightful interests.

> .    .    .    .    .

> "These rules for intestate succession may or may not reflect the intent of particular parents. Many will think that it is unfortunate that the rules are so rigid. Others will think differently. But the choices reflected by the intestate succession statute are choices which are within the power of the State to make. The Federal Constitution does not give this Court the power to overturn the State's choice under the guise of constitutional interpretation because the Justices of this Court believe that they can provide better rules. Of course, it may be said that the rules adopted by the Louisiana Legislature 'discriminate' against illegitimates. But the rules also discriminate against collateral relations, as opposed to ascendants, and against ascendants as opposed to descendants. Other rules determining property rights based on family status also 'discriminate' in favor of wives and against 'concubines.' .  .  .  Some of these discriminatory choices are perhaps more closely connected to our conceptions of social justice or of the ways in which most dying men wish to dispose of their property than the Louisiana rules governing illegitimate children. It may be possible that some of these choices are more 'rational' than the choices in Louisiana's categories of illegitimates. *But the power to make rules to establish, protect, and strengthen family life as well as to regulate the disposition of property left in Louisiana by a man dying there is committed by the Constitution of the United States and the people of Louisiana to the legislature of that State. Absent a specific constitutional guarantee, it is for that legislature, not the life-tenured judges of this Court, to select from among possible laws.* We cannot say that Louisiana's policy provides a perfect or even a desirable solution or the one we would have provided for the problem of the property rights of illegitimate children. Neither can we say that Louisiana does not have the power to make laws for distribution of property left within the State."

401 U.S. at 537–39, 91 S.Ct. at 1020–21, 28 L.Ed.2d at 293. (emphasis added).

*Labine* and the present case both involve attacks on features of the Louisiana community property system but there is yet another similarity. In *Labine*, the Court emphasized that the statute did not create an insurmountable barrier for the illegitimate child, but that the father could have left as much as one-third of this estate to the child by will had he wished to. Similarly, articles 2334 and 2404 did not present an insurmountable barrier to Ms. Feenstra had she wished to exercise greater control over the community immovables.

---

**4.** The Court noted, however, that "[e]ven if we were to apply the 'rational basis' test to the Louisiana intestate succession statute, that statute clearly has a rational basis in view of Louisiana's interest in promoting family life and of directing the disposition of property left within the State." 401 U.S. at 536 n. 6, 91 S.Ct. at 1019, 28 L.Ed.2d at 292.

Louisiana regards "marriage in no other view than as a contract," La.Civil Code art. 86, and like any other contract, certain requirements and formalities are prescribed by law. The parties must be willing and able to contract. *Id.* art. 90. They must be of a suitable age to contract. La.R.S. 9:282. The consent of each must be freely given, La.Civil Code art. 91, and where the consent has not been freely given or where there has been a mistake as to the identity of a party, the contract may be annulled. *Id.* art. 110.

As with any other contract, each party to the contract of marriage acquires certain rights and owes certain duties. A husband and wife owe the mutual obligations of "fidelity, support and assistance." *Id.* art. 119. "Fathers and mothers, by the very act of marrying, contract together the obligation of supporting, maintaining, and educating their children." *Id.* art. 227. The collection of rights and duties of the spouses concerning their matrimonial property, because it arises from the marriage contract, also is contractual.

"Matrimonial regimes are those plans of order between husband and wife particularizing the manner in which they shall share (if at all) and control their assets and liabilities. Since 1825, all Louisiana matrimonial regimes that might arise upon marriage have been contractual. Under the Digest of 1808, every marriage subject to Louisiana law entailed 'of necessity,' or as a matter of public order, the community of gains as specified in the legislation. Neither a complete separation of property (assets and liabilities) nor a modification of the community of gains could be stipulated by marriage contract; but the spouses could thereby make provisions for donations to each other, donations from other persons to either or both of them and the children to be born of the marriage, a dowry, or any other patrimonial arrangement which did not contradict the community of gains,

other imperative laws, or principles of public order or good morals. The Civil Code of 1825, however, permitted the spouses to modify the community of gains in any way and even to exclude it entirely, leaving them free to enter into a marriage contract specifying any patrimonial arrangement they might confect so long as it did not offend minimal provisions for good public order and morals. The law remains the same today. The community of gains is 'super-induced' by every marriage subject to Louisiana law *only if the spouses either have not entered into a marriage contract, or have entered into one which does not modify or reject that community regime.* This freedom to modify and reject the community of gains changed the character of that regime from one imposed by law to one essentially conventional. Thus, spouses must be deemed to have contracted tacitly the community of gains to the extent they have not contracted expressly against it." (Emphasis supplied) [5]

The contractual nature of the community regime is expressly acknowledged by several Civil Code articles:

"*Article 2325.* In relation to property, the law only regulates the conjugal association, in default of particular agreements, which the parties are at liberty to stipulate as they please, provided they are not contrary to good morals, and under the modifications hereinafter prescribed.

"*Article 2332.* The partnership, or community of aquets [acquets] or gains, needs not be stipulated; it exists by operation of law, in all cases where there is no stipulation to the contrary.

But the parties may modify or limit it; they may even agree that it shall not exist.

"*Article 2424.* Married persons may, by their marriage contract, modify the legal community, as they think fit, either by agreeing that the portions shall be un-

---

5. Pascal, *Updating Louisiana's Community of Gains,* 49 Tul.L.Rev. 555, 555–56 (1975) (footnotes omitted).

equal, or specifying the property belonging to either of them, of which the fruits shall not enter into the partnership [community]."

Moreover, Ms. Feenstra, having failed to protect her home by elimination or modification of the community regime through a marriage contract, was entitled to the protection of article 2334, the very provision which she attacks as unconstitutional had she sought to make it. Article 2404 designates the husband as the head and master of the community and gives him the power to alienate community property without the wife's consent or permission. It is article 2334 that permitted the wife to file a declaration to prevent the alienation without her consent of community immovables standing in the names of both spouses. Both article 2404 and article 2334 were provisions of the contract entered into by the Feenstras at the time of their marriage. It may have been a poor bargain on Ms. Feenstra's part, but it was one freely made and one with which she must live.

The choice of a matrimonial property system is one best made on the state level by the people who must live with the choice. The people of Louisiana have chosen to permit the parties to each marriage to select their own community property regime. It is only where the parties do not specify a particular regime that the law provides one for them. Thus, the system contained in Louisiana's Civil Code is an optional one; anyone wishing to avoid it may easily do so. Considering this, we find that nothing in the Equal Protection and Due Process Clauses of the Fourteenth Amendment requires that we nullify the matrimonial property system chosen by the people of Louisiana.

Accordingly, the motion of the State of Louisiana for summary judgment on the second counterclaim is GRANTED.