WILLIAM H. ECKEL, as Administrator of the Estate of KEN-
NETH H. ECKEL, Deceased, Respondent, v JAMES HASSAN et
al., Appellants.

Second Department, January 16, 1978

## APPEARANCES OF COUNSEL

*Rivkin, Leff & Sherman* for appellants.

*Anthony V. Barbiero, P. C.,* for respondent.

### OPINION OF THE COURT

COHALAN, J.

The issue on this appeal involves the legal rights of an "illegitimate" child. It comes before us on a matter of pleading. Plaintiff seeks to amend both a complaint and a bill of

particulars, in a wrongful death action, to include an allegedly posthumous child as a distributee of his putative father's estate's potential pecuniary award. Special Term granted the motion and we affirm the order entered thereon.

The issue further concerns an interpretation of chapter 357 of the Laws of 1975 which, in amending the Estates, Powers and Trusts Law, established a new section 5-4.5 ("Illegitimate children")* which proclaims that: "For the purposes of this part, an illegitimate child is the distributee of his father and the father of an illegitimate child is that child's distributee." By "this part" the Legislature was referring to part 4 of article 5 of EPTL, entitled: "Rights of members of family resulting from wrongful act, neglect or default causing death of decedent."

In section 3 of chapter 357 the Legislature provided: "This act shall not affect causes of action accruing prior to its effective date." Section 4 thereof provided: "This act shall take effect immediately."

The effective date was July 1, 1975. The body of the amendment was adopted at the recommendation of the Law Revision Commission. (See McKinney's Session Laws of New York, 1975, pp 1564-1567.) The wording of section 3 was added by the Legislature on its own initiative.

On March 9, 1973 plaintiff's intestate, Kenneth H. Eckel, perished in a fire at his dwelling place (owned by defendants, or one of them) wherein he and his fiancée were then residing. His fiancée was about three months pregnant at the time. The couple had arranged to formalize their irregular union by being married the very next day, March 10. Fate willed otherwise. Both parents of the deceased survived him. Limited letters of administration were issued to his father on September 6, 1973. The child of the alleged union was born 12 days later.

On this appeal the position of the appellants is that the amendment is prospective in nature and cannot breathe actionable life into a tragedy that occurred more than two years before its enactment. The respondent maintains that the very wording of the amendment indicates retroactivity and that, in any event, the amendment is merely a clarifying statute, or a codification of existing case law.

---

* Former section 5-4.5 was renumbered section 5-4.6 by section 2 of chapter 357 of the Laws of 1975.

We are called upon to construe the word "affect" as it instantly applies.

In Black's Law Dictionary (4th ed, p 79), "affect" is pertinently defined as "to act, or produce an effect upon * * * [a]cted upon, influenced, concerned". Thus, the word "affect" means to have an effect upon.

■ From these definitions we view the statute as if it reads: "This act shall *have no effect upon* causes of action accruing prior to its effective date".

We posit this reasoning on the belief that the Legislature did not act in a vacuum when it added the amendment. Common sense tells us that it was aware of the wrongful death actions discussed below, which antedated its passage. The modern trend is to treat "illegitmates", whenever it can be done, on the same plane as children born in wedlock.

This reasoning becomes especially true when we see the manner in which the courts have treated the problem. For example, for one to qualify as a distributee of an estate, as contrasted to sharing in the pecuniary award by way of verdict or settlement of a wrongful death action, an order of filiation declaring paternity during the lifetime of the putative father is required *(Matter of Lalli,* 43 NY2d 65), on remand from the Supreme Court of the United States [431 US 911] for further consideration in the light of *Trimble v Gordon,* 430 US 762; see, also, EPTL 4-1.2, subd [a], par [2]; Family Ct Act, § 517). No such limitation was placed upon sharing in the proceeds of the death action itself, assuming proof of the relationship to have been established. (See *Matter of Ortiz,* 60 Misc 2d 756; *Matter of Perez,* 69 Misc 2d 538; *Matter of Johnson,* 75 Misc 2d 502.) Each of these three cases involved a wrongful death action on behalf of a child, or children, of the putative father. (See, also, *Holden v Alexander,* 39 AD2d 476.) This was pointed out strikingly in *Levy v Louisiana* (391 US 68). There, on behalf of five "illegitimate" children, suit was brought for the wrongful death of their mother. After setbacks in the lower courts, the Supreme Court of the United States, in reversing, said that (p 72):

"Legitimacy or illegitimacy of birth has no relation to the nature of the wrong allegedly inflicted on the mother. These children, though illegitimate, were dependent on her; she cared for them and nurtured them; they were indeed hers in the biological and in the spiritual sense; in her death they suffered wrong in the sense that any dependent would.

"We conclude that it is invidious to discriminate against them when no action, conduct, or demeanor of theirs is possibly relevant to the harm that was done the mother." (See, also, *Glona v American Guar. Co.,* 391 US 73.)

In commenting upon the *Levy* decision, Surrogate SOBEL of Kings County noted, in *Matter of Ross* (67 Misc 2d 320, 323): "The point, of course, is that the *Levy* decision has commanded a 'judicial' amendment of the wrongful death distribution statute. It commanded that an illegitimate child be treated as a legitimate child. The statute (EPTL 5-4.4) must be read—'The damages * * * are exclusively for the benefit of the decedent's distributees *which shall include illegitimate children'.*"

This theory was expatiated upon in 1972 in *Holden v Alexander (supra),* wherein it was emphasized that an order of filiation was not a prerequisite to sharing in a wrongful death action award, as contrasted with sharing in the estate itself. There we held that where a putative father had supported a child for 17 years prior to her death in an automobile accident, and had permitted his name to be placed on both her birth and baptismal certificates, he could qualify as a distributee for the purpose of maintaining a wrongful death action, even though he had never obtained an order of filiation. The holding was on the ground of invidious discrimination.

It is worth repeating at this point that the Legislature inserted section 3 of chapter 357 of the Laws of 1975 at its own instance, even though the Law Revision Commission's suggestion that the act be effective immediately (see ch 357, § 4) was included in the chapter. This, we may reasonably infer, was to blunt the effect of the statement in section 52 of McKinney's Statutes (McKinney's Cons Laws of NY, Book 1, p 102) that "a provision in an amendatory statute that 'this act shall take effect immediately' has been held to exclude the idea that it should be retroactive" (citing *Matter of Beckford v Cheshire,* 128 Misc 10; *Abelson v Abelson,* 59 Misc 2d 172).

We point out, also, that if the administrator had acted with more dispatch in prosecuting the action on behalf of the infant, his present motion to amend would have been made, and presumably granted, months before the amendatory statute became effective. To bring this into focus, the time sequence shows that the child was born on September 18, 1973, the action was commenced on January 14, 1974 and the amendment became effective on July 1, 1975.

As an example of cases in which statutes have been held retroactive in their application, see *Matter of Mlodozeniec v Worthington Corp.* (9 AD2d 21 [Workmen's Compensation Law, § 44-a]) and *Matter of Marcelin v Scott* (33 AD2d 588 [Civil Rights Law, § 79-c]).

As we view it, therefore, for the Legislature to have intended other than to apply the statute retroactively, would have been tantamount to a legal absurdity and, in view of prevailing case law, a deprivation of a vested right.

In section 141 of McKinney's Statutes ("Avoidance of objectionable consequences"), it states that: "It is a fundamental rule of statutory interpretation that of two constructions which might be placed upon an ambiguous statute one which would cause objectionable consequences is to be avoided *[Metropolitan Life Ins. Co. v Durkin,* 301 NY 376]. Stated in another way, the rule is that the construction to be adopted is the one which will not cause objectionable results, or cause inconvenience, hardship, injustice, mischief or absurdity [see *Olson v Kilian,* 203 Misc 847, which involved a question of pleading as to the interpretation of the Highway Traffic Act of the Province of Ontario, Canada]. The Legislature is presumed to have intended that good will result from its laws, and a bad result suggests a wrong interpretation *[Simonelli v City of New York,* 276 App Div 405, affd 301 NY 752]."

In view of the adjudicated cases, it would be an absurdity to ascribe to the Legislature a meaning that would cause a retrogression of the continuing surge in the courts to ameliorate the hitherto invidious discrimination directed against "illegitimate" children claiming through a putative father in a wrongful death action.

A pointed example of retroactivity is found in CPL 440.10. That section, in large part, is a codification of the writ of error *coram nobis,* the genesis of which is found in early English common law. The entire CPL was adopted effective September 1, 1971. Yet no one would seriously suggest that all *coram nobis* applications acted upon before the codification are suspect because of this fact.

In like manner, the Legislature was merely making clear its acceptance of settled case law by applying its *nihil obstat* to formal enactment of the statute under consideration.

Socially and historically the lot of children born out of wedlock has not been a happy one. They have been held up uniformly to scorn and contumely. Even so prominent a public

personage as Alexander Hamilton was forced to .suffer in angry silence the uncharitable taunt of John Adams that he was the "bastard brat of a Scotch pedlar *[sic]."*

Fortunately, the stigma that has visited the sins of parents on their offspring has been lifted to some extent in the past few generations. Ameliorative statutes have been enacted, and favorable judicial decisions have been rendered, placing them, as far as possible, on a plane with those who have been born on the right side of the blanket.

In affirming, we echo the suggestion made at Special Term that because of a possible conflict of interest a guardian should be appointed to protect the interests of the child at such proceedings as may eventuate, and to adduce the proof, if any, required to establish paternity.

LATHAM, J. P., RABIN and HAWKINS, JJ., concur.

Order of the Supreme Court, Nassau County, dated September 21, 1976, affirmed, with $50 costs and disbursements.