[This opinion has been published in *Ohio Official Reports* at 74 Ohio St.3d 279.]

BROOKBANK, ADMR., APPELLEE, *v.* GRAY, APPELLANT.

[Cite as *Brookbank v. Gray*, 1996-Ohio-135.]

*Torts—Negligence—Wrongful death—"children," as used in R.C. 2125.02(A)(1), construed—Child born out of wedlock not foreclosed from recovering damages for wrongful death of his or her putative father where paternity had not been established during the putative father's lifetime—Common pleas court has jurisdiction to determine paternity of child born out of wedlock in conjunction with a wrongful death claim.*

———————————

1. The term "children," as used in R.C. 2125.02(A)(1), includes all natural or adopted children, whether legitimate, legitimated, acknowledged or illegitimate.

2. A child born out of wedlock is not foreclosed from recovering damages for the wrongful death of his or her putative father, simply because paternity had not been acknowledged, adjudicated or otherwise established during the putative father's lifetime. Paternity may be established after the death of the decedent in order to permit an illegitimate child recovery under the Wrongful Death Act for the wrongful death of his or her father.

3. The court of common pleas has jurisdiction to determine the paternity of a child born out of wedlock in conjunction with a wrongful death claim.

(Nos. 94-1945 and 94-1946—Submitted October 24, 1995—Decided January 17, 1996.)

APPEAL from and CERTIFIED by the Court of Appeals for Hamilton County, No. C-930312.

———————————

**{¶ 1}** On July 1, 1989, Thomas K. Walker was killed when the motorcycle he was operating collided with an automobile driven by appellant, Eugene P. Gray. Appellee, Kellie L. Brookbank, was appointed administrator of Walker's estate and, on March 28, 1991, filed a complaint, later amended, against appellant in the Hamilton County Court of Common Pleas, alleging the wrongful death of Walker. In her amended complaint, appellee sought "to recover hospital and funeral expenses incurred by decedent's mother and otherwise for the benefit of the beneficiaries set forth in Ohio Revised Code §2125.02(A)(1), namely, James Tyler Brookbank, son of the decedent; Kellie L. Brookbank, wife of the decedent; Antonie Walker, mother of the decedent; and Iris Webb and Delores Martinez, sisters of the decedent."

**{¶ 2}** On March 23, 1993, the trial court entered partial summary judgment against appellee "on the claims of Kellie L. Brookbank, as common-law surviving spouse, and James Tyler Brookbank, as illegitimate son, as beneficiaries under the wrongful death statute, Ohio Revised Code §2125.01 *et seq.*" With respect to James, the trial court, relying exclusively on *Hunter-Martin v. Winchester Transp., Inc.* (1991), 71 Ohio App.3d 273, 593 N.E.2d 383, motion to certify overruled, 62 Ohio St.3d 1408, 577 N.E.2d 361, found that an "[i]llegitimate child cannot maintain a wrongful death action on behalf of his deceased father where the paternity action to establish the parent-child relationship was brought after the purported father was killed in an automobile accident." The trial court rejected a challenge to its finding on equal protection grounds, finding further that "[t]he state has an obvious interest in requiring that illegitimate children be acknowledged before the death of the father to avoid establishing a process which would be ripe for fraud and the filing of multitudinous frivolous actions." The court then entered a Civ.R. 54(B) certification, finding no just reason for delay.

**{¶ 3}** Appellee filed a notice of appeal with respect to both her claim as common-law wife and James' claim as the illegitimate son of decedent. In her brief

to the court of appeals, however, appellee limited her argument to "only the issue concerning an illegitimate's right to recover damages for his father's wrongful death."

{¶ 4} The court of appeals reversed the trial court, holding that "in a wrongful-death action the issue of parentage may be raised after the death of the putative father and it may be litigated in the court of common pleas." In so holding, the court of appeals found that under the Ohio Parentage Act, specifically R.C. 3111.06(A), "a paternity action can be brought in the juvenile court after 'the alleged father is deceased'"; and that "the common pleas court has concurrent jurisdiction with the juvenile court to determine whether Walker is the father of James." Accordingly, the court did not address the constitutional issues.

{¶ 5} The cause is now before the court pursuant to the allowance of a discretionary appeal (No. 94-1945). Further, the court of appeals, finding its judgment to be in conflict with the decision of the Third Appellate District in *Hunter-Martin v. Winchester Transp.* (1991), 71 Ohio App.3d 273, 593 N.E.2d 383, and the Second Appellate District in *Hopping v. Erie Ins. Co.* (Mar. 20, 1990), Clark App. No. 2649, unreported, certified the record of the case to this court for review and final determination (No. 94-1946).

———————————

*Richard G. Ward Co., L.P.A.,* and *Richard G. Ward,* for appellee.

*McCaslin, Imbus & McCaslin, John J. Finnigan, Jr., and Matthew R. Skinner,* for appellant.

———————————

**ALICE ROBIE RESNICK, J.**

{¶ 6} The primary issue confronting the court is whether a child born out of wedlock is foreclosed from recovering damages for the wrongful death of his or her putative father, where paternity had not been established during the putative father's lifetime.

{¶ 7} R.C. 2125.02(A)(1)[1] provides that an action for wrongful death shall be brought for the exclusive benefit of, among others, the "children *** of the decedent." The term "children," however, is nowhere defined in the Wrongful Death Act, R.C. Chapter 2125. Ohio courts of appeals have, until this case, filled this gap by holding that unrecognized illegitimate children are not "children," as that term is used in the Wrongful Death Act, when suing for the wrongful death of their alleged fathers. See *infra.* In so holding, these courts have relied exclusively upon cases defining the term "children" or "child" in accordance with other bodies of law, particularly that of descent and distribution. Thus, in order to fully consider the propriety of these decisions, it is necessary to trace the history by which these two bodies of law--inheritance and wrongful death--became commingled.

{¶ 8} In *Muhl's Admr. v. Michigan S. RR. Co.* (1859), 10 Ohio St. 272, the court considered the issue of an illegitimate child's right to recover for the wrongful death of his mother. The court found that "the nearness or remoteness of kin on the part of the son of the deceased mother *** depended [not] at all upon the circumstances of his being born within or without lawful wedlock." *Id.* at 277. Accordingly, it was held that "the fact of such child's legitimacy or illegitimacy can in no respect affect the right of action in his behalf." *Id.* at paragraph two of the syllabus.

{¶ 9} Later, in *White v. Randolph* (1979), 59 Ohio St.2d 6, 13 O.O.3d 3, 391 N.E.2d 333, appeal dismissed *sub nom. Jackson v.* White (1980), 444 U.S. 1061, 100 S.Ct. 1000, 62 L.Ed.2d 743, the court held that the provisions of R.C. Chapter 2105, the Statute of Descent and Distribution, do not violate equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution or

---

1. Former R.C. 2125.02(A)(1) provided:

"An action for wrongful death shall be brought in the name of the personal representative of the decedent for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent, all of whom were rebuttably presumed to have suffered damages by reason of the wrongful death, and for the exclusive benefit of the other next of kin of the decedent."

Section 2, Article I of the Ohio Constitution. In so holding, the court set forth the substance of those provisions and their underlying rationale as follows:

"'In Ohio, a child born out of wedlock is capable of inheriting from and through his mother, R.C. 2105.17, but may inherit from his father only under certain circumstances. As pointed out in *Moore* [*v. Dague* (1975), 46 Ohio App.2d 75, 76-77, 75 O.O.2d 68, 69, 345 N.E.2d 449, 450], *supra,* the father may legitimatize an illegitimate child by afterwards marrying the mother of the illegitimate child and acknowledging the child as his. R.C. 2105.18. Further, the natural father of an illegitimate child may confer upon such child a right of inheritance from such child by several means: (1) by formal acknowledgement in Probate Court that the child is his with consent of the mother (R.C. 2105.18); (2) by designating the illegitimate child as his heir-at-law (R.C. 2105.15); (3) by adopting the illegitimate child; and (4) by making a provision for the child in his will.

"'***

"'It has long been recognized in Ohio that proof of paternity, especially after the death of the alleged father, is difficult, and peculiarly subject to abuse. One of the resultants of such abuse would be the instability of land titles of real estate left by intestate fathers of illegitimate children.'" *Id.* at 8, 13 O.O.3d at 4-5, 391 N.E.2d at 334.

{¶ 10} After the court's decision in *White*, the General Assembly enacted the Ohio Parentage Act, R.C. Chapter 3111, effective June 29, 1982. The Act provides an alternate method of establishing the paternity of any child alleged to have been born out of wedlock. It applies to any provisions of the Revised Code which "confer or impose rights, privileges, duties, and obligations" on the basis of a parent-child relationship. R.C. 3111.01(A). The parent and child relationship established pursuant to R.C. 3111.01 to 3111.19 "extends equally to all children and all parents, regardless of the marital status of the parents," former R.C. 3111.01(B); an action for parentage may be brought by or on behalf of the child,

R.C. 3111.04(A); and "[t]he judgment or order of the court determining the existence or nonexistence of the parent and child relationship is determinative for all purposes," R.C. 3111.13(A).

{¶ 11} In addition, R.C. 3111.06(A),[2] in prescribing where an action may be brought, suggests that an action for establishing parentage may be brought even "if the alleged father is deceased."

{¶ 12} Not surprisingly, a split developed in the lower courts after the enactment of the Ohio Parentage Act over whether, for purposes of inheriting from and through the putative father, an illegitimate child may establish paternity *post mortem*. Some courts have held in favor of allowing paternity to be established after the death of the alleged father for purposes of gaining inheritance rights. *In re Estate of Hicks* (1993), 90 Ohio App.3d 483, 629 N.E.2d 1086; *Martin v. Davidson* (Apr. 19, 1989), Summit App. No. 13840, unreported, certification dismissed on other grounds (1990), 53 Ohio St.3d 240, 559 N.E.2d 1348; *Alexander v. Alexander* (1988), 42 Ohio Misc.2d 30, 537 N.E.2d 1310 (paternity may be established by genetic testing irrespective of the limitations period set forth in R.C. 3111.05).

{¶ 13} On the other hand, in *Beck v. Jolliff* (1984), 22 Ohio App.3d 84, 22 OBR 237, 489 N.E.2d 825, it was held that "the word 'child' as used in the Statute of Descent and Distribution, R.C. 2105.06, now includes the child born out-of-wedlock as well as the legitimate child if the parent-child relationship has been

---

2. R.C. 3111.06(A) provides:

"The juvenile court has original jurisdiction of any action authorized under sections 3111.01 to 3111.19 of the Revised Code. An action may be brought under those sections in the juvenile court of the county in which the child, the child's mother, or the alleged father resides or is found or, if the alleged father is deceased, of the county in which proceedings for the probate of his estate have been or can be commenced, or of the county in which the child is being provided support by the department of human services of that county. If an action for divorce, dissolution, or alimony has been filed in a court of common pleas, that court of common pleas has original jurisdiction to determine if the parent and child relationship exists between one or both of the parties and any child alleged or presumed to be the child of one or both of the parties." (139 Ohio Laws, Part I, 2183.)

established *prior to death of the father pursuant to the parameters of R.C. Chapter 3111. ***"*  (Emphasis added.)  *Id.* at 88, 22 OBR at 241, 489 N.E.2d at 829.

{¶ 14} The wrongful death cases, decided primarily in the courts of appeals, adopted the law as enunciated in *White* and *Beck, supra*, for purposes of defining the term "children *** of the decedent" as used in R.C. 2125.02(A)(1).  Under these cases, illegitimate children must utilize the methods through which they can gain inheritance rights in order to qualify as beneficiaries under the Wrongful Death Act.  Thus, some sort of *inter vivos* formal acknowledgement or legitimation pursuant to the Statute of Descent and Distribution, or judicial determination of paternity pursuant to the Parentage Act, is a prerequisite to the illegitimate child's right to recover under R.C. 2125.02 for the wrongful death of his or her putative father.  *Hunter-Martin, supra*; *Bonewit v. Weber* (1952), 95 Ohio App. 428, 54 O.O. 20, 120 N.E.2d 738; *Hopping v. Erie Ins. Co.* (Mar. 20, 1990), Clark App. No. 2649, unreported.  But, see, *Purnell v. Akron* (C.A.6, 1991), 925 F.2d 941.

{¶ 15} The fallacy of combining such disparate bodies of law, however, is immediately apparent.  As the Supreme Court of Texas aptly explained in *Garza v. Maverick Market, Inc.* (Tex.1989), 768 S.W.2d 273, 275:

"The court of appeals held that in order to have standing to sue under the Wrongful Death Act, an illegitimate child must comply with the requirements of the Family Code and Probate Code, specifically, Tex.Fam.Code Ann. § 13.01 et seq.  (Vernon Supp.1987) and Tex.Prob.Code Ann. §42(b) (Vernon Supp.1987), 744 S.W.2d at 288-89.  However, this court, in *Brown v. Edwards Transfer Co.,* 764 S.W.2d 220 (Tex.1988), rejected engrafting onto the Wrongful Death Act the requirements of the Probate Code for an illegitimate child to inherit from his father.  The court reasoned that while the Probate Code provided an in-depth system for disposition of property incident to estates, it did not by that statute intend to provide an appropriate means to identify classes of persons entitled to sue under the Wrongful Death Act.

"Similarly, in our present case it is inappropriate to incorporate the requirements of legitimation under the Family Code in the Wrongful Death Act. The two bodies of law are simply too disparate in application for such combination. The obvious purpose of chapter 13 of the Family Code is to protect the rights of mothers and putative fathers, and to serve the best interest of the child. The text of that chapter shows that it was neither designed or even intended to address tort actions; nor was it designed to protect tortfeasors. The equally obvious purpose of the Wrongful Death Act, on the other hand, is to provide a means whereby surviving spouses, children, and parents can recover for the loss of a family member by wrongful death. Absent any indication by the legislature that it intended the legitimation provisions of the Family Code to apply to the Wrongful Death Act, we will not make that application ourselves.

"We hold that in a wrongful death action an illegitimate child need not be 'recognized' in accordance with other bodies of law not specifically applicable to the Wrongful Death Act."

{¶ 16} The same is true of the Ohio statutes. Nothing in the Statute of Descent and Distribution indicates that the General Assembly intended its provisions relative to inheritance rights of illegitimate children to apply to delineate beneficiary status under the Wrongful Death Act. Concomitantly, the Wrongful Death Act does not incorporate "heirship" into its provisions. In fact, beneficiaries "may include relatives who would not be eligible to inherit under R.C. § 2105.06, the statute of descent and distribution." McCormac, Wrongful Death in Ohio (1982) 12, Section 2.07; 1 Anderson's Ohio Probate Practice and Procedure (1995) 523-524, Section 27.04. Nor does any provision comparable to R.C. 2105.15, 2105.17 or 2105.18 appear in the Wrongful Death Act to indicate that rights thereunder are conditioned in any way upon which parent dies or the status of a child as legitimate, acknowledged or legitimated. In addition, wrongful death proceeds are recovered for exclusive distribution to those beneficiaries designated

as such under the Wrongful Death Act, and form no part of the decedent's estate. See *In re Estate of Craig* (1993), 89 Ohio App.3d 80, 84-85, 623 N.E.2d 620, 624; *Fogt v. United Ohio Ins. Co.* (1991), 76 Ohio App.3d 24, 29, 600 N.E. 2d 1109, 1111.

{¶ 17} There are other fundamental differences in the two statutes which render it inappropriate to commingle them. The state's interest in providing for the accurate determination of property ownership at death, so formidable in the inheritance context, is absent in wrongful death actions. Also, any presumption that can be made that a father who did not legitimate his illegitimate offspring did not intend to leave his property at death to such child is irrelevant in wrongful death cases. Moreover, in inheritance actions illegitimate children compete directly against other next of kin, thus automatically diminishing the share of such other next of kin. In wrongful death actions, damages are measured by the injuries suffered by all statutory beneficiaries individually. See, *e.g., In re Estate of Ortiz* (1969), 60 Misc.2d 756, 761-762, 303 N.Y.S.2d 806, 812. In addition, the "fear of spurious claimants, [is] a problem more formidable in estate situations than in wrongful death actions in which the amount of the recovery will depend critically upon the amount of *** injury shown." *Schmoll v. Creecy* (1969), 54 N.J. 194, 200, 254 A.2d 525, 528.

{¶ 18} Although not cited by appellant, we have found one recent case that purports to bolster the propriety of engrafting inheritance law onto the Wrongful Death Act by reference to R.C. 2125.02(A)(3)(a). That section provides that:

"The *date of the decedent's death fixes,* subject to division (A)(3)(b)(iii) of this section, *the status of all beneficiaries of the action for purposes of determining the damages suffered by them and the amount of damages to be awarded.* A person who is conceived prior to the decedent's death and who is born alive after his death is a beneficiary of the action." (Emphasis added.)

{¶ 19} In *Martin v. Daily Express, Inc.* (N.D.Ohio 1995), 878 F.Supp. 91, 95, one of the issues that arose was whether a probate court order, issued after the death of the putative father, could be considered a formal acknowledgement of the father's illegitimate offspring. In addressing this issue, that court found that the italicized language of R.C. 2125.02(A)(3) "means that no individual can become a beneficiary under the statute by virtue of actions taken after the death of the decedent. Simply, the decedent did not take any action to formally acknowledge his paternity of the two minors before his death, and the probate court's order cannot be interpreted as a posthumous formal acknowledgement."

{¶ 20} We disagree with the federal district court's interpretation of R.C. 2125.02(A)(3).[3] It assumes its own conclusion that the status of an illegitimate child as beneficiary under the statute is somehow dependent upon *inter vivos* recognition, a result already shown to be achieved only by virtue of the displacement of the provisions of the Statute of Descent and Distribution. Absent any "overtones of Victorian or other notions of provincial morality," the term "'children' of a decedent" encompasses "*all* natural or adopted children of the decedent." (Emphasis *sic*.) *Armijo v. Wesselius* (1968), 73 Wash.2d 716, 719, 440 P.2d 471, 472. Thus, "[t]he child with a biological connection to the tort victim, whether a legitimate, legitimated or illegitimate child, has the right to bring an action for wrongful death. ***" *Chatelain v. Dept. of Transp. & Dev.* (La.1991), 586 So.2d 1373, 1376.

---

3. This provision was first enacted as part of Am.Sub.H.B. No. 332, effective February 5, 1982. The purpose of Am.Sub.H.B. No. 332 was stated to be "[t]o amend sections 2125.01, 2125.02, and 2125.03 of the Revised Code to authorize the court or jury in a wrongful death action to award compensatory damages." 139 Ohio Laws, Part II, 2458. The primary effect of R.C. 2125.02(A)(3)(a) was to supersede prior case law holding that if a beneficiary dies prior to trial or judgment, his interest dies with him and his estate does not succeed to his wrongful death claim. *Davis v. New York Cent. RR. Co.* (1954), 160 Ohio St. 474, 52 O.O. 356, 117 N.E.2d 39; *Fini v. Perry* (1928), 119 Ohio St. 367, 164 N.E. 358; *Doyle v. Baltimore & Ohio RR. Co.* (1909), 81 Ohio St. 184, 90 N.E. 165. The language, however, is obviously much broader in scope.

**{¶ 21}** The child who establishes a biological link to the wrongful death victim does not "become a beneficiary under the statute by virtue of actions taken after the death of the decedent." *Martin, supra,* 878 F.Supp.at 95. Instead, the critical actions which resulted in the person becoming a beneficiary obviously and necessarily occurred prior to the death of the decedent. The status of a beneficiary may not be changed, but it certainly may be proved. This may account for the fact that in the thirteen years since the disputed language of R.C. 2125.02(A)(3) was added to the statute, no other court has interpreted it to preclude proof of paternity *post mortem*.

**{¶ 22}** Thus, we hold that the term "children," as used in R.C. 2125.02(A)(1), includes all natural or adopted children, whether legitimate, legitimated, acknowledged or illegitimate. A child born out of wedlock is not foreclosed from recovering damages for the wrongful death of his or her putative father, simply because paternity had not been established during the putative father's lifetime. Paternity may be established after the death of the decedent in order to permit an illegitimate child recovery under the Wrongful Death Act for the death of his or her father.[4]

**{¶ 23}** While the above is dispositive of the issue of standing, there is another reason why we cannot interpret the statute as the trial court did. This is because "[w]here reasonably possible, a statute should be given a construction which will avoid rather than a construction which will raise serious questions as to its constitutionality." *Co-operative Legislative Commt. of Transp. Bhd. v. Pub. Util. Comm.* (1964), 177 Ohio St. 101, 29 O.O.2d 266, 202 N.E.2d 699, paragraph two of the syllabus. We believe that a serious question would be raised as to whether it is a violation of equal protection to deny an illegitimate child the right to

---

4. The illegitimate child whose paternity has been established or acknowledged *inter vivos* may still bring an action for the wrongful death of his or her father. Nothing in this opinion shall be construed to change that result.

recover for the wrongful death of his or her putative father, unless paternity was acknowledged or adjudicated during the father's lifetime. While at this juncture, we would normally avoid the constitutional issues, we find it necessary to address them here so as to avoid any future uncertainty regarding the rights of illegitimate children to recover for the wrongful death of their parents.

**{¶ 24}** Historically, the illegitimate child has been forced, both socially and legally, to bear the brunt of the sins of his parents. Society resented the illegitimate child as "'a living symbol of social irregularity.'" Krause, Equal Protection for the Illegitimate (1967), 65 Mich.L.Rev. 477, fn. 4, quoting Davis, Illegitimacy and the Social Structure (1939), 45 Am.J. Sociology 215. "Over the centuries he has been the innocent object of prejudice transferred from the guilt of his conception," *Franklin v. Julian* (1972), 30 Ohio St.2d 228, 229, 59 O.O.2d 264, 265, 283 N.E.2d 813, 814; his predicament compared to the "application of the Old Testament (Exodus 20) commandment 'visiting the iniquity of the fathers upon the children,'" *In re Woodward's Estate* (1964), 230 Cal.App.2d 113, 118, 40 Cal.Rptr. 781, 784. Consequently, at common law he was deemed *nullius filius*—the child of nobody— and thereby denied many of the rights accorded a legitimate child. See Notes and Comments, Out for Blood: Proving Paternity When Daddy's Dead (1992), 13 J. of Juv.L. 80; Annotation, Discrimination on Basis of Illegitimacy as Denial of Constitutional Rights (1971), 38 A.L.R.3d 613, 615, Section 1.

**{¶ 25}** Vestiges of the common-law rule obviously still remain in the Statute of Descent and Distribution. Whether or not this has been changed by the enactment of the Ohio Parentage Act is inconsequential for purposes of an equal protection analysis. Even if the Parentage Act were interpreted to preclude illegitimate children from claiming inheritance rights from and through their natural fathers absent an adjudication of paternity *inter vivos*, it is clear that the Ohio intestate succession scheme would nevertheless be constitutional. In providing several options by which the illegitimate child may effectuate inheritance rights

12

*inter vivos*, including acknowledgement, legitimation and a right of action by the child to establish paternity, Ohio law would still fall within that "'middle ground between the extremes of complete exclusion and case-by-case determination of paternity that could allowably be included within the state legislation.'" *White, supra,* 59 Ohio St.2d at 9, 13 O.O.3d at 5, 391 N.E.2d at 335. See, also, *Lalli v. Lalli* (1978), 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503; *Trimble v. Gordon* (1977), 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed. 2d 31; *Labine v. Vincent* (1971), 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288.

**{¶ 26}** If the matter were as simple as applying these rules to the wrongful death cases, the constitutional inquiry would end here. The matter, however, is not that simple. To withstand the intermediate level of scrutiny applied to discriminatory classifications based on illegitimacy, the "statutory classification must be substantially related to an important governmental objective." *Clark v. Jeter* (1988), 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465, 471. In wrongful death statutory schemes, the focus shifts away from regulation of property ownership and toward the tort arena. Depending upon the nature of recoverable damages, various levels of protections against spurious claims and multiple lawsuits are built into wrongful death statutes. Thus, the equal protection analysis will play out differently here than in the inheritance cases.

**{¶ 27}** In *Levy v. Louisiana* (1968), 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436, the United States Supreme Court held that the Louisiana wrongful death statute, construed to deny a right of recovery by illegitimate children for the wrongful death of their mother, creates an invidious discrimination in contravention of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The court stated that:

"Legitimacy or illegitimacy of birth has no relation to the nature of the wrong allegedly inflicted on the mother. These children, though illegitimate, were dependent on her; she cared for them and nurtured them; they were indeed hers in

the biological and in the spiritual sense; in her death they suffered wrong in the sense that any dependent would." *Id.*, 391 U.S. at 72, 88 S.Ct. at 1511, 20 L.Ed.2d at 439.

{¶ 28} *Levy* can be fairly interpreted as a proscription against barring the rights of unacknowledged illegitimate children to recovery in a wrongful death action.[5] This is because, as pointed out in a dissenting opinion appearing in *Glona v. Am. Guar. & Liab. Ins. Co.* (1968), 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441, rehearing denied (1968), 393 U.S. 898, 89 S.Ct. 66, 21 L.Ed.2d 185, but applying also to *Levy*, under Louisiana law an illegitimate child could recover for the wrongful death of a parent who has acknowledged or legitimated the child. 391 U.S. at 79, 88 S.Ct. at 1513, 20 L.Ed.2d at 445 (Harlan, J., dissenting).

{¶ 29} In *Weber v. Aetna Cas. & Sur. Co.* (1972), 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768, the Supreme Court held unconstitutional a Louisiana workers' compensation statute that denied dependent unacknowledged illegitimate children the right to recover benefits for the death of their natural father. In that case, the Louisiana Supreme Court attempted to distinguish *Levy* as involving a statute which absolutely excluded all illegitimate children from recovery as opposed to excluding only unacknowledged illegitimate children. The court, however, refused to dispose of *Levy* "by such finely carved distinctions." 406 U.S. at 169, 92 S.Ct. at 1403, 31 L.Ed.2d at 775.

{¶ 30} The court also found workers' compensation statutes and wrongful death statutes to be similar in origin and purpose, but dissimilar to inheritance statutes. "Both the statute in *Levy* and the statute in the present case involve state-created compensation schemes, designed to provide close relatives and dependents

---

5. In *Baston v. Sears* (1968), 15 Ohio St.2d 166, 168, 44 O.O.2d 144, 145, 239 N.E.2d 62, 63, at fn., the court stated that "[t]he rights announced in *Levy* were based on the intimate, familial relationship which exists between a mother and her child, whether the child is legitimate or illegitimate." *Baston*, however, was overruled by *Franklin, supra*, 30 Ohio St.2d at 234, 59 O.O.2d at 268, 283 N.E.2d at 817, fn. 5.

of a deceased a means of recovery for this often abrupt and accidental death. Both wrongful-death statutes and workmen's compensation codes represent outgrowths and modifications of our basic tort law." *Id.*, 406 U.S. at 171, 92 S.Ct. at 1404, 31 L.Ed.2d at 776-777.

{¶ 31} On the other hand, the court distinguished *Labine, supra,* on the basis that "[t]hat decision reflected, in major part, the traditional deference to a state's prerogative to regulate the disposition at death of property within its borders. \*\*\* The Court has long afforded broad scope to state discretion in this area. Yet the substantial state interest in providing for 'stability of \*\*\* land titles and in the prompt and definitive determination of the valid ownership of property left by decedents,' is absent in the case at hand." (Citations omitted.) 406 U.S. at 170, 92 S.Ct. at 1404, 31 L.Ed.2d at 776.

{¶ 32} Nevertheless, the court in *Weber* recognized that a certain amount of deference must be afforded to state legislatures to impose rules to facilitate difficult problems of proving paternity. However, the court did not believe that its decision undermined the state's interest in this regard. Under Louisiana's compensation scheme, a showing of dependency was a prerequisite to the recovery of death benefits. Thus, the statute already provided a means by which to lessen the possible problems of multiple and uncertain claims of parenthood. 406 U.S. at 174-176, 92 S.Ct. at 1406-1407, 31 L.Ed.2d at 778-779.

{¶ 33} Finally, in *Parham v. Hughes* (1979), 441 U.S. 347, 99 S.Ct. 1742, 60 L.Ed.2d 269, the Supreme Court considered the reverse situation where a father who had not legitimated his child sought to recover for the child's wrongful death. The court upheld a denial of an action to the father, finding that "[u]nlike the illegitimate child for whom the status of illegitimacy is involuntary and immutable, the [father] here was responsible for fostering an illegitimate child and for failing to change its status." 441 U.S. at 353, 99 S.Ct. at 1746, 60 L.Ed.2d at 276.

**{¶ 34}** The court also addressed the relationship between the statutory classification and the state's objective in dealing with difficult problems of proof, as follows:

"Of particular concern to the State is the existence of some mechanism for dealing with 'the often difficult problem of proving the paternity of illegitimate children and the related danger of spurious claims against intestate estates.' *Lalli v. Lalli, supra* [439 U.S.], at 265 [99 S.Ct. at 523, 58 L.Ed.2d at 509]. See also *Gomez v. Perez*, 409 U.S. [535], at 538 [93 S.Ct. 872, 875, 35 L.Ed.2d 56, 59-60].

"This same state interest in avoiding fraudulent claims of paternity in order to maintain a fair and orderly system of decedent's property disposition is also present in the context of actions for wrongful death. If paternity has not been established before the commencement of a wrongful-death action, a defendant may be faced with the possibility of multiple lawsuits by individuals all claiming to be the father of the deceased child. Such uncertainty would make it difficult if not impossible for a defendant to settle a wrongful-death action in many cases, since there would always exist the risk of a subsequent suit by another person claiming to be the father. The State of Georgia has chosen to deal with this problem by allowing only fathers who have established their paternity by legitimating their children to sue for wrongful death, and we cannot say that this solution is an irrational one. *Cf. Lalli v. Lalli*, 439 U.S. 259 [99 S.Ct. 518, 58 L.Ed.2d 503]." 441 U.S. at 357-358, 99 S.Ct. at 1748-1749, 60 L.Ed.2d at 278-279.

**{¶ 35}** Under a superficial analysis, it could be argued that the court adopted the "middle ground" approach applicable to the inheritance statutes. Under closer scrutiny, however, it becomes clear that the court did no more than recognize the same important governmental interest in facilitating difficult problems of proving paternity that it had already recognized in *Weber,* and simply applied it to the unique scenario in *Parham*. The situation in *Parham* involved a suit by a father, not the child. More importantly, the Georgia statute at issue in *Parham* based the

amount of recovery in wrongful death actions on the "'full value of the life of the decedent.'" 441 U.S. at 368, 99 S.Ct. at 1754, 60 L.Ed.2d at 285, fn. 19 (White, J., dissenting). This type of statute does not provide any protection against uninjured or undeserving parents, thereby exacerbating the concern over the problem of fraudulent claims.

{¶ 36} None of these cases—*Levy, Weber* and *Parham*—is directly on point in determining whether the trial court's interpretation in the case *sub judice*, if accepted, could withstand equal protection scrutiny. They do, however, provide a framework for analysis. As applicable here, the cases identify the need to establish some method to deal with the danger of fraudulent claims and to accord finality to wrongful death actions as important governmental objectives. Whether a particular statutory classification based on illegitimacy is substantially related to those objectives in wrongful death statutes depends critically upon the extent to which the statute already has built into it protection against the evils sought to be avoided.

{¶ 37} Under Ohio's Wrongful Death Act, damages are keyed to the losses suffered by the surviving beneficiaries. The amount of damages is determined on the basis of pecuniary and dependency-related factors. Accordingly, unlike the Georgia statute at issue in *Parham*, our statute provides protection against uninjured or undeserving potential distributees. Moreover, the two-year time limitation on bringing a wrongful death action imposed by R.C. 2125.02(D) is not merely a time limitation on the remedy; it is a restriction which qualifies the right of the action itself. See *Sabol v. Pekoc* (1947), 148 Ohio St. 545, 36 O.O. 182, 76 N.E.2d 84, paragraph one of the syllabus. Thus, it is not tolled by a beneficiary's minority. See *Taylor v. Black & Decker Mfg. Co.* (1984), 21 Ohio App.3d 186, 21 OBR 199, 486 N.E.2d 1173. These provisions operate to substantially reduce the possibility of spurious and multiple claims. Any further attempt to achieve such objectives by eliminating recovery for substantial classes of illegitimate children looks suspiciously like a shield for invidious discrimination.

{¶ 38} Wrongful death by its nature defies prediction; the tortious death of a parent may occur at any time during a child's life. Prior thereto, it may not have been feasible or desirable for a father to have acknowledged or legitimated his illegitimate offspring. Unlike the intestacy situation, the presumed intent of the father is unrelated to the nature of the harm to the child. The child's mother or guardian may not have been willing or possessed the sophistication or incentive to have ensured protection of the child by seeing to acknowledgement, legitimation or adjudication of paternity before the father's death. There is, however, no good reason to further punish the child because of the ineptitude or procrastination of his or her caretakers. Moreover, a father who willingly accepts his obligations to support and nurture his illegitimate child is less likely to be the subject of a paternity action. Consequently, those illegitimate children who have suffered the greatest loss and possess the most viable claims for their father's wrongful death are the very children most likely denied recovery by a rule requiring *inter vivos* establishment of paternity.

{¶ 39} Thus, most courts have refused to burden the illegitimate child with the consequences resulting when those to whose care the child has been entrusted have failed to protect the child's interests. Thus, there is a general refusal in wrongful death cases to accept any classification that purports to establish a connection between *inter vivos* recognition and/or adjudication, on the one hand, and the harm suffered by the illegitimate child, on the other hand, particularly where the loss is ultimately determined under the statute on the basis of pecuniary or dependency-related factors. Accordingly, most post-*Levy* decisions have distinguished the inheritance cases, and have held that formal acknowledgement or adjudication of paternity prior to the putative father's death cannot be imposed as a prerequisite to permitting the illegitimate child to recover for the father's wrongful death. *Millman v. Cty. of Butler* (1993), 244 Neb. 125, 134-135, 504 N.W.2d 820, 826-827; *Chatelain, supra* (status as "child" used defensively); *Garza, supra*;

*Brown v. Edwards Transfer Co.* (Tex.1988), 764 S.W.2d 220; *Crane v. Mekelburg* (Colo.App.1984), 691 P.2d 756, 760-761; *Hurt v. Supreme Court of Arizona* (1979), 124 Ariz. 45, 601 P.2d 1329; *Eckel v. Hassan* (1976), 87 Misc.2d 1057, 386 N.Y.S.2d 995, affirmed *Eckel v. Hassan* (1978), 61 A.D.2d 13, 401 N.Y.S.2d 820; *Jordan v. Delta Drilling Co.* (Wyo.1975), 541 P.2d 39, overruled in part, *Wetering v. Eisele* (Wyo.1984), 682 P.2d 1055; *In re Estate of Niles* (1975), 81 Misc.2d 937, 367 N.Y.S.2d 173, affirmed *In re Estate of Niles* (1976), 53 A.D.2d 983, 385 N.Y.S.2d 876; *In re Estate of Johnson* (1973), 75 Misc.2d 502, 348 N.Y.S.2d 315; *Warren v. Richard* (La.App.1973), 283 So.2d 507, affirmed (1974), 296 So.2d 813; *Evans v. Atlantic Cement Co.* (Fla.App.1973), 272 So.2d 538; *In re Estate of Perez* (1972), 69 Misc.2d 538, 330 N.Y.S.2d 881; *Weaks v. Mounter* (1972), 88 Nev. 118, 493 P.2d 1307; *Jenkins v. Collette* (E.D.La.1971), 335 F.Supp. 47; *Cannon v. Transamerican Freight Lines* (1971), 37 Mich.App. 313, 194 N.W.2d 736 (interpreting Ohio law regarding right of recovery by posthumous illegitimate child prior to enactment of R.C. 2125.02[3][A]'s posthumous exception); *Juarez v. System Leasing Corp.* (1971), 15 Cal.App.3d 730, 93 Cal.Rptr. 411; *In re Estate of Ortiz, supra*; *Schmoll v. Creecy, supra*. See, also, *Armijo, supra* (pre-*Levy* decision); Annotation, Right of Illegitimate Child, after *Levy v. Louisiana*, to Recover Under Wrongful Death Statute for Death of Putative Father (1977), 78 A.L.R.3d 1230, Section 5; Annotation, Right of Recovery, Under Wrongful Death Statute, for Benefit of Illegitimate Child or Children of the Decedent (1984, 1995), 72 A.L.R.2d 1235, Later Case Service, Sections 3 and 5.

{¶ 40} Accordingly, we find that any interpretation of our Wrongful Death Act that precludes illegitimate children from establishing paternity after the death of their putative father for purposes of recovering for the wrongful death of the putative father is violative of their equal protection rights as guaranteed by the Fourteenth Amendment to the United States Constitution and Section 2, Article I of the Ohio Constitution.

**{¶ 41}** Also, we agree with the court of appeals that the issue of an illegitimate child's paternity "may be litigated in the court of common pleas." Contra, see *In re Estate of Hicks, supra*, 90 Ohio App.3d at 488, 629 N.E.2d at 1089. The juvenile court has been given "original jurisdiction" to determine the paternity of children born out of wedlock. R.C. 2151.23(B)(2); 3111.06(A). This is in contrast to the "exclusive original jurisdiction" given to the juvenile court over other matters. R.C. 2151.23(A). Moreover, R.C. Chapter 3111 evinces no legislative intent to establish R.C. Chapter 3111 paternity proceedings as the exclusive method by which paternity may be determined or the parent-child relationship effectuated. *In re Custody of Davis* (1987), 41 Ohio App.3d 81, 534 N.E.2d 946. Thus, the concurrent original jurisdiction of the court of common pleas with regard to all civil matters is unaltered, and such court has jurisdiction to determine the issue of paternity of a child born out of wedlock in conjunction with a wrongful death claim. See *Standifer v. Arwood* (1984), 17 Ohio App.3d 241, 244, 17 OBR 508, 511, 479 N.E.2d 304, 308; 2 Anderson's Ohio Family Law (1989) 106, Section 10.15. See, generally, *Seventh Urban, Inc. v. Univ. Circle Property Dev., Inc.* (1981), 67 Ohio St.2d 19, 23-24, 21 O.O.3d 12, 15, 423 N.E.2d 1070, 1074.

**{¶ 42}** In light of the foregoing, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, WRIGHT, F.E. SWEENEY and PFEIFER, JJ., CONCUR. COOK, J., concurs separately.

———————————

**COOK, J., concurring.**

**{¶ 43}** I concur in the syllabus, judgment and reasoning of the court on the primary issue. Because I find the discussion of the constitutional issue to be unwarranted, I do not concur with that portion of the opinion. See, e.g.*, Hal Artz*

*Lincoln-Mercury, Inc. v. Ford Motor Co*. (1986), 28 Ohio St.3d 20, 28 OBR 83, 502 N.E.2d 590, paragraph two of the syllabus, citing *State ex rel. Herbert v. Ferguson* (1944), 142 Ohio St. 496, 27 O.O. 415, 52 N.E.2d 980, paragraph two of the syllabus (constitutional questions will not be addressed unless necessary).

_____